OVERTON, J.
 

 Thomas C. Anderson died testate in the city of New Orleans on December 10, 1931. He bequeathed all of his property, amounting to over $120,000, after the payment of debts, and $7,500 in special legacies, to his widow, Mrs. Gertrude Dix Anderson, ignoring Mrs. Irene Anderson Delsa, who claimed to be his legitimate daughter, and who is the widow of George Delsa, and the mother of four living children.
 

 Mrs. Delsa is the only person claiming to be a child of Anderson. In view of the fact that Anderson had ignored her in his will, she filed a petition in his succession, claiming her légitime, or the one-third of his estate, under article 1493 of the Civil Code, reading, in part: “Donations inter vivos or .mortis causa can not exceed two-thirds of the property of the disposer, if he leaves, at his decease, a legitimate child; one-half, if he leaves two children ; and one-third, if he leaves three or a greater number.” The petition contained other demands unnecessary to mention, as they have been abandoned.
 

 The defense, which is interposed by the universal legatee and executrix, Mrs. Anderson,
 
 *69
 
 is that Mrs. Delsa is not the legitimate child of Anderson.
 

 There was judgment below recognizing Mrs. Delsa as the sole child and forced heir of Anderson, reducing the legacy in favor of Mrs. Anderson to the disposable portion,, so as to allow Mrs. Delsa, subject to the debts and charges of the succession, one-third of the estate, but rejecting her demands, since abandoned in all other respects. The executrix and universal legatee has appealed.
 

 The appeal presents, as the sole issue in the case, Is Mrs. Delsa the legitimate child of Anderson? If she is, she is entitled to her légitime.
 

 It is Mrs. Delsa’s contention that she is the sole issue of the marriage of Anderson with Emma Schwartz. There is no record evidence of the marriage. Both parties to the alleged marriage were natives and residents of the city of New Orleans. This fact makes it likely, though by no means certain, that the marriage, if solemnized, was solemnized in New Orleans. Search was made in New Orleans for written evidence of the marriage, but none was found. It appears, however, that the marriage license records of the period when the marriage was supposed to have taken place, namely, between 1878 and 1880, are incomplete ; some having been destroyed by fire in 1895, and other records being, in whole or in part, missing. Therefore resort was had to other evidence to establish the marriage of Anderson and Emma Schwartz and the legitimacy of Mrs. Delsa.
 

 Mrs. Delsa was born in New Orleans on May 13, 1880, at No. 253 St. Louis street, according to the plan of numbering then used. A month and five days later her birth was registered in the office of the city board of health,' on the application of the child’s mother, as the lawful issue of Thomas Anderson, aged 27 years, occupation, bookkeeper, and Emma Schwartz, aged 19. On the day following this registration, notice of the birth was published in the New Orlean’s papers of that time, as follows: Mrs. Thomas Anderson, a daughter, May 13.
 

 A year and a half later, Emma Schwartz died of typhoid fever. Anderson took his mother to the funeral. Shortly after the burial of Emma Schwartz, possibly due to the inability of his mother and of the Schwartz family to care for the child, then but little over 18 months old, and his own inability, Anderson took the child, it is said regretfully, to St. Vincent’s Infant Asylum and entered her there. The register of the asylum contains the following entry:
 

 “Admitted, November 26, 1881; Irene Anderson ; (Mrs. Delsa) born May 5, 1880, in New Orleans; baptized; father, Thomas O. Anderson; mother, Emma Schwartz, dead. Placed by aunt and father. Sent to Carroll-ton in 1885.”
 

 Irene Anderson, as she was registered in St. Vincent’s Asylum, was removed from that iri7 stitution and taken by Anderson, when she reached the age of 5, to St. Mary’s Convent, á dormitory school in New Orleans. There he visited Irene regularly, and took Mrs. Catherine Archer Boeder Anderson, whom he married in 1884, three years after the death of Emma Schwartz, and from whom, several years later, he was divorced, to visit her. Anderson paid Irene’s expenses at St. Mary’s. Irene graduated from that institution when she reached the age of 16 years. She then
 
 *71
 
 went to reside with Anderson and his mother. Anderson’s mother and Irene became devoted to each other. When the former died, which was in 1000, Irene continued to live with her father until her marriage.
 

 ’ Touching the death of Anderson’s mother, we'Quote from the Daily Picayune’of January 22/1900, as tending to show the status which Irene occupied in the community:
 

 “Last evening, at the family residence, No. '2123 Canal, a large gathering of friends joined' Mr. Thomas C. Anderson and' his daughter, Miss Irene, in paying their tribute of love and affection to the memory of that pious, venerable and charitable woman, Mrs. Honorah Anderson. * * * Father Downey delivered a brief eulogium of the deceased and to the bereaved sqn and granddaughter tendered words of consolation and comfort.”
 

 While these are not Anderson’s words, and ■are not binding upon him or his universal ■legatee, still Anderson’s conduct for some time thereafter towards Irene shows that they are in full accord with that conduct.
 

 Irene married George Delsa, an employee of Anderson, on April 24, 1902, at which time she was 22 years of age. The marriage was .celebrated in St. Joseph’s Church, in the presence of a large number of friends. She was .taken to the altar and given away in marriage . by Anderson. She became the mother of seven children, four' of whom are alive. One of those deceased was named after Anderson’s ■mother, by his request, and another, still .alive, by like request, bears the name of Thomas Anderson Delsa. In the Southern Buck, of March, 1916, a publication issued by ,the New Orlean’s Lodge of Elks, a photograph was published, at Anderson’s request, of himself, Mrs. Delsa, and her four living children. In the legend attached to the picture,Mrs. Delsa is referred to as Anderson’s daughter.
 

 In 1911 and 1912, while off on trips, Anderson wrote several letters to Mrs. Delsa, addressing her as “My dear Daughter,” and closing the letters as “Your loving father,’’signing his name to them.
 

 In January, 1928, Anderson, then being apprehensive of approaching death, wrote a will, which was later revoked by him, and therefore was never admitted to probate. This will was offered and received in evidence for the limited purpose of showing that Anderson recognized Mrs. Delsa as his daughter and her children as his grandchildren. Eor this limited purpose the will was admissible. The will contained a legacy to each of his four grandchildren of $5,060, a bequest of the remainder of his estate ‘.‘to my daughter, Mrs. Irene Anderson Delsa,” and “to Mrs. Gertrude O. Dix of Erie, Mich., share and share alike.”
 

 The foregoing are the main facts relied on to show Mrs. Delsa’s descent from Anderson, and, it being undisputed that she was born of Emma Schwartz, to create a presumption that she was the lawful issue of both, by reason of his long-continued fatherly attitude towards her.
 

 The foregoing facts, as far as they go, tend to show that Anderson and Emma Schwartz were lawfully married. Let us now see what facts there are bearing, we might say, more directly on the asserted marriage. During the period in which it is urged that Anderson was married to Emma Schwartz, he was in the employ of the Insurance Oil Tank Compa
 
 *73
 
 ny. . Several of those who worked there with him testify that he made no secret of his marriage, and that it was generally known and accepted as a fact, among his coemployees, that he had married. When Irene was horn, they knew that he had a daughter. No one there questioned the legitimacy of the child. Anderson did not announce the name of the young lady he married, but simply said that he had married a girl who lived uptown. This young lady, from the facts before us, could not have been any other .than Emma Schwartz. .
 

 Anderson and Emma Schwartz, the record justifies us in saying, lived together as man and wife at 253 (old number) St. Louis street, and it is there, as we have said, that Irene was born and that Emma Schwartz died. Those in the immediate community who knew them recognized them as man and wife, and no witness is produced, who knew them at that time, who says to the contrary. Anderson’s mother referred, at least, upon one occasion to the marriage, and her attitude towards Irene, to whom she was devoted, shows that she recognized the marriage. Members of the Schwartz family testify that the existence of the marriage was recognized in that family, and that Emma Schwartz’s mother frequently ref erred, to Anderson as her son-in-law.
 

 On September 1, 1909, pursuant to Act No. 122 of 1908, requiring notaries to give the matrimonial status of parties to acts passed by them, Anderson, in a notarial act, declared that he was married to Emma Schwartz; the declaration reading as follows, to wit:
 

 “The present vendor (Anderson) declared under oath that he has been married hut twice and then 1st, to Emma Schwartz who departed this life over twenty-three years ago, and' secondly to Catherine Archer Roeder from whom he was legally divorced as per judgment rendered on June 7,1899, and signed June 13, 1899, of Civil District Court for the Parish of Orleans under the No. 48601 of the docket of said court and that he has never-married since.”
 

 The universal legatee and executrix as-: serts that the declaration, made by Anderson, has been altered since the execution of, the deed, and therefore that the deed is not admissible in evidence until the alteration is satisfactorily explained. Upon this question it was said in Pipes v. Hardesty, 9 La. Ann. 152, 61 Am. Dec. 202, that:
 

 “From these authorities it results, that the presumption is against the validity of a deed which presents on its face a material inter-, lineation; but that this is not a presumption juris et de jure. It yields to contrary proof;. and even to concurrent circumstances, which create a strong presumption that the interline-, ation was made before the execution and delivery of the deed.”
 

 In the case at bar, there is evidence show-: ing that the alterations are in the same hand-, writing as the remainder of the written pai;t of the deed, in the same ink, and written with the same pen. Besides, the deed, though the making of the alterations are not noted there-; in, contains strong evidence within itself that the alterations were made before its execution and delivery. The alterations consist of three, which occur, in the original, in the last half of the second line of the declaration, in
 
 *75
 
 the clause now
 
 reading,
 
 “has
 
 been married
 
 •but twice and then 1st to Emma Schwartz.” The word “twice” is superimposed over another word, possibly the word “once”; the word “1st” is inserted between the word “then” and the word “to”; the name “Emma Schwartz” is superimposed over another name, possibly the name “Kate Roeder,” and then follow in regular order, without any alteration whatever, the words, “who departed this life over twenty-three years ago,” and then the remaining words of the declaration.
 

 The words, “who departed this life over twenty-three years ago” could have fitted no other person whatever than Emma Schwax-tz, so far as the record discloses, who might have been considered the wife of Anderson. They certainly could not have been considered descriptive of Catherine Archer Roeder, who was still alive. They could not, for these reasons, have been inserted after the words, “who departed this life over twenty-three years ago,” were written, for these words not only follow, without break or interlineation or erasure, the name of Emma Schwartz, but their use is appropriate only to hei\ The conclusion that the declaration was altered, before the execution and delivery of the deed, is strengthened by the fact that about two months after its execution, a time not suspicious, a certified copy thereof was issued which shows conclusively on its face that the alteration had then been made. The fact that the notary was later convicted of forging oth-' er acts does not overthrow the proof of the genuineness of the declaration.
 

 Our conclusion is that the act was admissible in evidence. Such being so, it affords written evidence of Anderson’s acknowledgment that he married Emma Schwartz, made at a time unsuspicious. The acknowledgment, it may be observed, is in full accord with his past acts and conduct. Although Anderson seems to have omitted her name in two or three other acts and declarations; nevertheless here is affirmative proof of acknowledgment.
 

 Thereafter Anderson became infatuated with Gertrude Dix, the universal legatee and executrix herein. For the past few years her moral life has been beyond reproach, but at this period she was well known in the underworld. Anderson lived with her in open concubinage for some years. She had been kind to him and had nursed him through a serious illness. His doctor advised him some three or four years before his death to remove from the upper apartment in which he was living with Gertrude Dix to the lower floor of some dwelling — this, in order to protect his heart. Anderson thereupon CQncluded to build him a suitable house for himself and Mrs. Dix, on property belonging to him, adjoining the home of Mrs. Delsa, which home, or the lots upon which the dwelling was constructed, Anderson had given Mrs. Delsa.
 

 Mrs. Delsa, when notified by Anderson of his intention, protested against his taking his then mistress there. This enraged Anderson. Mrs. Delsa thereafter wrote Anderson a note, bearing no date, a copy of which she made and retained. This copy was produced by her on the trial, and was verified by her in evidence. The note reads as follows:
 

 “As your daughter, I am sorry for speaking as I did to you. I was so vexed, to know, you have chosen such a person (referring to Mrs. Dix) to guide you. You have completely
 
 *77
 
 forgotten the respect yon owe the good name of your mother and mine, and the promise you made on your dying bed, to the Almighty God, through the good priest and friend, Father Weldon, to live a better life if God spared you. I will always pray to God, to help you, and some day re-unite us with the same love I have always had for you.”
 

 This note enraged Anderson, apparently, all the more. Under date of July I8, 1928, he wrote Mrs. Delsa quite a lengthy letter, addressing her simply as Mrs. George Delsa. He expressed resentment at the use of the expression, by Mrs. Delsa, concerning his selection “such a person to guide you.” He denied that he was being led by any woman, and spoke very highly and kindly of Mrs. Dix. He informed Mrs. Delsa that he intended to marry Mrs. Dix in a few days, and also that some day he would give her (Mrs. Delsa) her own history. He also said, among other .things, that Mrs. Delsa’s mother was “such a woman” as Mrs. Delsa characterized Mrs. to be.
 

 This letter was excluded by the trial judge, and, as we shall hereafter see, correctly so, because it appears upon its face to be filled with such motives as make unsworn statements concerning pedigree inadmissible, although they are only indirect statements. The only relevancy of the letter, which was offered by the universal legatee and executrix in support of her case, to the issue presented, were such indirect statements, or insinuations, it contains having a bearing on the legitimacy of Mrs. Delsa.
 

 In December or January, 1929, Anderson went to consult his attorney about the drawing of a will. He told his attorney that he wanted to disinherit his daughter, Irene. He was advised that the law confined disinherison to certain prescribed causes, and repeated to Anderson the causes, set forth in article 1021 of the Civil Code. Anderson said that none of the causes were applicable to Mrs. Delsa, and his attorney, who had ascertained the facts, advised him that he was not in position to disinherit Mrs. Delsa. Anderson pondered a while, and then said to his attorney: “She is not my legal daughter. I was never married to her mother.” He then, from a per-pared form, wrote his will, omitting Mrs. Delsa therefrom, not even mentioning her name. This is the will that was probated, and bears date January 16,1930.
 

 Prior to the writing of the will, but after the controversy arose between Anderson and Mrs. Delsa, Anderson wrote a letter, bearing date April 15, 1929, addressed to Mr. Louis P. Samsot and Mr. H. D. Smith, Jr., and to whom it may concern, but addressed the envelope containing the letter to Mrs. Gertrude Anderson, who had become his wife, with directions, written on the envelope reading: “To be opened after my death and only to be used as per contents.”
 

 In this. letter Anderson declared that he was not the father of Mrs. Delsa, and that, while he called her his daughter, he did so for her benefit and protection. He stated in the letter that he had never married Emma Schwartz, and was not responsible for her loss of virtue, but met her as men meet women of the underworld — a statement, which it may be observed, so far as it affects the moral character of Emma Schwartz, is in conflict with the evidence adduced on the trial, showing the respect held for her and her family.
 
 *79
 
 He also said in the letter, which the record fully discloses is not correct, that Mrs. Delsa’s mother died of childbirth; the correct fact being that the mother died of typhoid fever, about eighteen months after the birth of her child, as appears from the records of the board of health. The letter contains directions that it is not to he used unless Mrs. Delsa or her family urge objections to the will or try to harm his wife in any manner. Attached to the letter was a copy of the entry, concerning the admission of the child in St. Vincent’s Infant Asylum, showing her birth, and the fact of her baptism. This letter was excluded by the trial court, among other reasons, for the obvious one that it contains statements concerning Mrs. Delsa’s descent, made after a controversy had arisen between Anderson and Mrs. Delsa, and therefore at a time when there was a motive existing to misrepresent the true facts. ■
 

 The universal legatee and executrix relies largely for success in this court upon having the court exclude, or attach no weight to, what she terms hearsay evidence, offered by Mrs. Delsa to show or raise a presumption of her legitimacy, or establish her legitimate descent, and to having this court overrule the trial court in excluding the declarations of Anderson, relative to the descent of Mrs. Delsa, made after a controversy had arisen between the two, or a motive to make incorrect statements had arisen. There are other points, which may be termed minor ones, upon which reliance is placed to obtain, or aid in obtaining, a reversal, which will be noticed, so far as may be necessary.
 

 It is not questioned that a large part of the evidence, offered by plaintiff, touching the legitimate descent of Mrs. Delsa, is hearsay evidence. The hearsay evidence, however, consists of statements made by members of both the Schwartz and Anderson families, now deceased, relative to references to the marriage of Anderson and Miss Schwartz and to the descent of Mrs. Delsa, made prior to any controversy between the parties, or to the arising of a motive to make false statements. Hearsay evidence of this character to show family history or descent is admissible. The reason for its admissibility is the necessity of the occasion, for frequently proof cannot be made otherwise. Thus, in Jones’ Commentaries on Evidence (2d Ed.) vol. S, § 1131, it is said:
 

 “Pedigree is the history of family descent, which is transmitted from one generation to another by both oral and written declarations and by tradition. Unless proved by hearsay evidence, not competent in general issues, it cannot in most instances be proved at all. * * *
 

 “That pedigree may be proved by hearsay testimony is settled. Such testimony is admitted because of the great difficulty, often impossibility, of proving the fact or degree of kinship between alleged relatives, because the subject of inquiry is so frequently of ancient date. Respecting what facts come within the meaning of the word pedigree, and by whom the declaration reproduced as hearsay must have been made, .there was some divergence of opinion in the earlier cases. But it seems to be settled now that a declaration, to be admissible, must not only have been by a person since deceased, but must also have been made by a person related by blood or affinity with some branch of the family the pedigree of
 
 *81
 
 which is in question.” See, also, Wigmore on Evidence (2d Ed.) vol. 3, § 1482; Greenleaf on Evidence (10th Ed.) vol. 1, § 14; Abbott’s Trial Evidence (4th Ed.) vol. 1, § 174.
 

 The circumstantial guaranty for trustworthiness, relative to declarations concerning pedigree, as said by Prof. Wigmore, is found "in the probability that the ‘natural effusions’ (to use Lord Eldon’s often-quoted phrase) of those who talk over family affairs when no special reason for bias or passion exists are fairly trustworthy, and should be given weight by judges and juries, as they are in the ordinary affairs of life.” Their admissibility is, however, dependent also upon whether the statements were made before a controversy arose regarding the descent However, “the existence of a controversy is only one circumstance (though the most common one) likely to produce a bias fatal to the trustworthiness of the declaration. Judicial opinion seems to hold, and properly, that other considerations may under certain circumstances operate to exclude the declarations. In general, they would be excluded where there is any specific and adequate reason to suppose the existence of a motive inconsistent with a fair degree of sincerity. In Lord Eldon’s words, they must appear to be the ‘natural effusions, of a party standing in an even position.” Wigmore on Evidence (2d Ed.) vol. 3, §§ 1482-1484. See, also, David v. Sittig, 1 Mart. (N. S.) 147, 14 Am. Dec. 179; McKelvey on Evidence, § 151; Philips on Evidence (5th Ed.) p. 228; Byrne’s Fed. Ev. p. 452; 22 C. J. p. 246.
 

 The evidence offered by Mrs. Delsa, touching statements made, bearing on her descent as the legitimate child of Anderson and Emma Schwartz and the history connected therewith, come well within the foregoing rules, and was admissible. On the other hand, the letter written by Anderson to Mrs. Delsa, reflecting indirectly upon her descent, having been written at a time when there was a motive to misrepresent facts, as was also the letter, written under similar circumstances, to be opened after his death, stating that Mrs. Delsa was of illegitimate birth, were properly excluded. This ruling applies also to the statement, made by Anderson, during the saíne period, touching the legitimacy.
 

 It is well established in this jurisdiction, as it is, we think, in others, that a marriage, in the absence of higher evidence, may be established by general reputation. Holmes v. Holmes, 6 La. 463, 26 Am. Dec. 482; Martinez v. Succession of Vives, 32 La. Ann. 305; Eames v. Woodson, 120 La. 1031, 46 So. 13; Succession of St. Ange, 161 La. 1085, 109 So. 909; Oliphant v. Lumber Co., 163 La. 601, 112 So. 500. Therefore the evidence offered by Mrs. Delsa to prove the marriage of Anderson and Emma Schwartz by general reputation was admissible. Such being the ease, we think it clear that the evidence adduced fully justifies the presumption of marriage, and therefore the presumption of the legitimacy of Mrs. Delsa to which presumptive marriage she traces.
 

 Not only may a child show its legitimacy by establishing the marriage by general reputation to which it traces, but it may also create the presumption that it was born during or as a result of marriage, and is therefore legitimate, by proving legitimate filiation as prescribed by articles 193,194, and 195 of the Civil Code. As was said in Boykin v. Jenkins, 174 La. 335, 140 So. 495, 497:
 

 
 *83
 
 “A presumption of legitimacy arises also from proof of legitimate filiation. The Code (article 193 et seq.) prescribes the methods of proving legitimate filiation. It may be proved by a transcript from the register of birth or baptism.
 

 “ ‘If the register of births and baptisms is lost, or if no such register has been kept, it suffices
 
 for the child to show that he has been constantly considered as a child bom during mwrriage.’
 
 (Italics ours.) Oiv. Code, art. 194.
 

 “The following article of the Code (article 195) provides that whether a -child has been considered born during a marriage may' be proved by a collection of facts ‘demonstrating the connection of filiation and paternity which exists between an individual and the family to which he belongs,’ the most material of which facts are: ‘That such individual has always been called by the surname of the father from whom he pretends to be born; that the father treated him as his child, and that he provided as such for his education, maintenance and settlement in life; that he has constantly been acknowledged as such in the world; that he has been acknowledged as such within the family.’
 

 “The making of such proof raises the presumption that the child was -born during or as a result of marriage, and is therefore.legiti-' mate.”
 

 This view seems to prevail in France. Marcadé, in commenting on article 197 of the French Civil Code, which is not out of accord with our article 195, in interpreting the expression “general reputation,” found in that article, says:
 

 “This general reputation is defined thus: The status resulting from the notoriety produced by a cumulation of facts all tending to prove the quality that a person enjoys in a family and in ¡Society. For the wife and for the child, it results from three elements: Nomen, tractus, and fama; nomen, having borne the name of the husband or of the father ; tractus, having been treated as a wife or as a legitimate child in the home and in the family; fama, having been respected as such in the eyes of the world.”
 

 In discussing the effect of proof by general reputation, on the question of legitimacy, Marcadé, vol. 1, p. 536, says:
 

 “However, this general reputation of the child, confirmed by the general reputation of his parents, and not contradicted by his act of birth, should be sufficient proof of his legitimacy and should dispense with the ordinary and regular proof (the production of the certificate of marriage), only when it is impossible for the child to become informed by his parents of the time and the place of the celebration.” Marcardé then says, in the following paragraph (but which we need not comment.upon, touching the extent of its applicability in this state), that a case is presented for the application of the foregoing doctrine when the parents are dead, which is the case here, or when their evidence cannot be obtained by reason of their insanity, or because of their having been declared absentees, both of which he likens to death as a cause of privation.
 

 In the Nouveau Code Civil Annoté, by Dalloz, vol. 1, p. 434, it is said, in discussing article 197 of the French Code, that:
 

 
 *85
 
 “Particularly, this presumption [of marriage and legitimacy] is not destroyed by the circumstance that the father and mother never had any other domicile than the place where they lived together publicly as man and wife, and that the records of that locality, regularly kept, do not contain any act of marriage which could be applicable to them.”
 

 We think that the record shows that Mrs. Delsa has created a presumption of her legitimacy by showing a presumption of marriage between her alleged parents and by proof of filiation. She has shown that Anderson told his eoemployees that he had married; that Anderson and Emma Schwartz lived together publicly as man and wife, until the death of the latter; that they were recognized as such by the neighborhood in which they lived; that Anderson was referred to frequently by Emma Schwartz’ mother as her son-in-law; that, when Emma Schwartz died, Anderson’s mother, in his company, attended the funeral; that members of the Schwartz family attended it; that Emma Schwartz, when Mrs. Delsa was but little over a month old, registered the birth of the child as the legitimate daughter of Anderson and herself; that, though Anderson did not appear as a party to the application to register, nevertheless, in less than eighteen months thereafter, following the death of Emma Schwartz, he took her child, in company with the child’s aunt, said to be a sister of Emma Schwartz, to an asylum, and there entered the child as his daughter and the daughter of Emma Schwartz deceased; 'that he paid the child’s tuition and expenses there for eleven years and visited the child there; that, when Mrs. Delsa graduated, he took her to his and his mother’s home, where she lived until she married; that he attended her marriage, and gave her away in marriage; and that he recognized her children as his grandchildren for years. These facts unquestionably create presumptions of marriage and legitimacy. Hobdy v. Jones, 2 La. Ann. 944; Blasini v. Succession of Blasini, 30 La. Ann. 1388; Bothick v. Bothick, 45 La. Ann. 1382, 14 So. 293; Succession of St. Ange, 161 La. 1085, 109 So. 909.
 

 The presumption of legitimacy, here established, becomes absolute unless overthrown. The evidence adduced by the universal legatee does not overthrow it.
 

 We have considered the remaining points, made by the executrix, referred to in another part of this opinion, such as the insufficiency of the evidence to show that Anderson ever resided on St. Louis street, at old No. 253; the contention being that Anderson resided with his mother on Prytania street at the time he was said to have been married to Emma Schwartz, and that 253 St. Louis street was then in the restricted district, which, it is urged, demonstrates that Emma Schwartz was only Anderson’s mistress. The evidence of apparently reputable witnesses, however, satisfies us that he did live on St. Louis street, and that the section of the street on which he lived was occupied by respectable families. The rest of these points, in our view, such as the error in the first name in which Emma Schwartz was buried, her identity being otherwise complete, the fact that she was buried in a pauper cemetery, at a time when Anderson was obviously without means, although, had he desired, he might have had her buried in the burial plot of the Fireman’s Association, of which he was a member, if she were
 
 *87
 
 his wife, are wholly insufficient to overthrow the presumption of legitimacy established.
 

 Mrs. Delsa, out of abundance of precaution, has filed an answer to the appeal, asking- us to amend, the judgment appealed from, granting her one-third of the estate, subject to the costs and charges, so as to make it clear that the costs of the succession and its charges do not include the attorney’s fees for defending the present suit. The lower court has not undertaken, in this proceeding, to cast the succession for attorney’s fees. The expression “costs and charges,” used by the trial court, has reference to such costs and charges only as are properly chargeable against the succession. Should the trial court ever decide that the attorney’s fees herein should, or should not be, taxed against the succession, it will be time enough to present the question, whether they should be so taxed, on appeal.
 

 The judgment is affirmed.
 

 The CHIEF JUSTICE is recused.