HIGGINS. Tustice.
The widow in community of the decedent appealed from the judgment of the district court, holding that the plaintiff was the legitimate daughter of the deceased by his first wife and is entitled, as his sole forced heir, to inherit his one-half interest in the community of acquets and gains which existed between him and his second wife. The case primarily involves issues of fact. We have carefully reviewed the record and it is our conclusion that the learned trial judge has clearly stated the issues, properly analyzed the evidence and correctly applied the law, and, therefore, we quote the pertinent part of his opinion with approval :
“James H. Rowland, an honored and respected citizen of the City of Shreveport, Caddo Parish, Louisiana, since 1907, died intestate on June 12, 1941. From 1900 to 1907 he resided in Memphis, Tennessee, where on January 22, 1902, he married the defendant, Mrs. Louise Tessier Rowland, who survives him. This marriage was without issue.
“Plaintiff, Mrs. Ferol Rowland Cameron, a resident of Pulaski County, Arkansas, brings this suit alleging that she is the only child of the deceased and sole heir to his estate, which is in the possession of defendant, who, without right, is claiming title thereto and ownership thereof and refuses to recognize petitioner as heir of her deceased father. Plaintiff prays for judgment recognizing her as only child and sole heir of the deceased and, as such, the owner, entitled to the possession of his estate and for an accounting from defendant.
“Plaintiff’s case is stated in Article II of her original petition reading:
“ ‘That the sai,d James Horace Rowland was twice 'married, his first wife being Laura Ellen Drummond, who died December 25, 1899, at Little Rock, Arkansas, and of which marriage your petitioner was the sole issue’,
and in Article III of her supplemental and amended petition, as follows:
“ ‘That in response to the order of this Court, petitioner now supplements and amends her petition so as to set forth such facts and information as is possessed by her at this time and avers:
“ ‘(a) .That according to her understanding she was born on or about April 24, 1888, at St. Joseph, Missouri.
“ ‘(b) That petitioner does not know the date or place of the marriage of her mother, Laura Ellen Drummond, and her father, James Horace Rowland.
“‘(c) That her mother, Laura Ellen Drummond Rowland, died when petitioner was about eleven years of age, but that as far back as petitioner can recall, her mother and father were living together as husband and wife; that following her birth they lived together as man and wife for several years in the State of Missouri, moving therefrom to Little Rock, Arkansas, about the year 1892, where they lived together as husband and wife, until late in the month of December, 1899, when her mother died; that they always conducted themselves toward each other as husband and wife, and that your petitioner lived with them as their child, bore their name, and was treated and acknowledged, and maintained by them, and each of them, as their child, and was taught by them, and each of them, that Laura Ellen Rowland, born Drum-mond, was her mother, and James Horace Rowland, was her father.
“ ‘(d) That her father, the said James Horace Rowland, always referred to and spoke of the said Laura Ellen Drummond, as his wife, and the said Laura Ellen Drum-mond, always referred to and spoke of the said James Horace Rowland, as her husband, and they were received into society where they lived as husband and wife and were treated by friends and relatives as having that status, and the members of the immediate families of each of them visited them in the home they maintained as husband and wife, and they in turn as man and wife visited and were received in the homes of the members of the immediate families of each of them.
“ ‘(e) That upon the death of her mother, Laura Ellen Drummond in December of 1899, her father, James Horace Rowland, buried her mother as his wife, placed a tombstone above her grave upon which he had inscribed, among other facts, that she was the wife of James Horace Rowland, and, thereafter during his remaining lifetime, he looked after and cared for said grave and its upkeep.
“ ‘(f) That her father, James Horace Rowland, following the death of her mother, reared, maintained, and educated your petitioner as his child and the offspring of himself and Laura Ellen Drum-mond Rowland, and in speaking of Laura *285 Ellen Drummond Rowland, over the years between her death in December of 1899, and his death in 1941, referred to Laura Ellen Drummond in terms of affection as his wife, and your petitioner as the issue of his marriage to her; and your petitioner was always given to understand by her said father, James Horace Rowland, that she was his child, the issue of his marriage to Laura Ellen Drummond, petitioner’s mother; and at no time during his lifetime did the said James Horace Rowland by word, act or deed, give petitioner to understand otherwise.
“ ‘(g) That the love and care showered upon your petitioner by each of her said parents during their lifetime; the high repute in which each was held by all who knew them; the good moral character each enjoyed; and the facts recited in Subdivisions (c) to (f), inclusive, hereof, except the number of years petitioner’s parents lived in Missouri, following petitioner’s birth, and the approximate date they moved to Little Rock, Arkansas, are circumstances of which petitioner has knowledge; however, petitioner avers that she has been informed by relatives that the said Laura Ellen Drummond, petitioner’s mother, left Jamesport, Missouri, where she resided, sometime between the Fall of 1885 and the Summer of 1887, to join and marry the said James Horace Rowland, petitioner’s father, who was then traveling from place to place in Missouri and in Iowa, and nearby states, soliciting orders, among other activities, for the enlargement of photos; that petitioner has no information as to the date and place they were married, but has been informed by relatives that they were living together as man and wife when petitioner was born and for more than a year prior thereto, and that this relationship continued under the circumstances, as set out in Subdivisions (c) to (e) inclusive, of this Article, until the death of the mother of petitioner.’
“The defense is set forth in paragraph (b) of Article 2 of defendant’s answer, reading:
“ ‘Defendant denies that James Horace Rowland was the father of plaintiff or was married to plaintiff’s mother, Laura Drum-mond.’
“On these issues the case went to trial. The record is voluminous. To undertake to discuss the evidence separately and in detail would extend this opinion to unwarranted length. We shall, therefore, endeavor to set forth, as briefly as we may, our findings of fact and our conclusions under the law we think applicable.
“Decision of this case, as we view it, depends upon determination of the following questions: (1) Were James H. Rowland and Laura Ellen Drummond ever lawfully married? (2) Was James H. Rowland plaintiff’s father? (3) Is plaintiff the heir of James H. Rowland?
“No record or documentary evidence of a marriage was produced and no one testified to having witnessed one. But, over defendant’s objection, evidence ali-unde was admitted on the authority of the cases cited below and the jurisprudence established by them, and others, that marriage, like other contracts, may be proved by any species of evidence not prohibited by law which does not presuppose a higher species of evidence within the power of the party. Holmes v. Holmes, 6 La. 463, 26 Am.Dec. 482; Philbrick v. Spangler, 15 La.Ann. 46; Blasini v. Blasini, 30 La.Ann. 1388; Succession of Curtis, 161 La. 1045, 109 So. 832; Succession of St. Ange, 161 La. 1085, 109 So. 909; Succession of Kneipp, 172 La. 411, 134 So. 376; Boykin v. Jenkins, 174 La. 335, 140 So. 495; Succession of Anderson, 176 La. 66, 145 So. 270; Succession of Gaudinse, 187 La. 844, 175 So. 595; Gray’s Succession, 201 La. 121, 9 So.2d 481.
“As was said by the Court in the case of Succession of Hubee, 20 Ann. 97, the rule has special application where petitioner is not a spouse seeking to prove a marriage, in which he or she was a party and who would be presumed to know all the facts and circumstances attending such marriage, but a child who has not and cannot be supposed to have, in regard to the marriage of his deceased parents, the same means of information.
“In the case of Succession of Gaudinse, 187 La. 844, 175 So. 595, the marriage was proved to the satisfaction of the court where the wife testified that she eloped when she was 14 or 15 years of age, because of parental objection, went to Mississippi by train and married, but could not remember either the place or date of the marriage.
“Plaintiff in this case is fifty-six years of age, born according to her understanding, in St. Joseph, Missouri, on or about April 24, 1888, and the Court views much of the evidence in this case with tolerance *286 of the testimony of witnesses undertaking to recall with accuracy dates and details. . Even so, much of the evidence concerning the controversial years ranging from 1886 to 1893 is in confusing conflict.
“There are, however, certain facts established to the Court’s satisfaction that afford a logical approach to determining the issues involved.
“Some time between 1889 to 1893, Jim Rowland moved to Little Rock, Arkansas, to live. He brought with him this plaintiff and plaintiff’s mother, as members of his family. He and plaintiff’s mother held themselves out to the public as husband and wife and plaintiff as their child. They began housekeeping in a home as any family would do. Plaintiff’s earliest recollections are as a child, in this home in Little Rock, and not until after Mr. Rowland’s death was it ever suggested to her that she was not his child. Until December 25, 1899, a period of from six to ten years, when plaintiff’s mother died, he and plaintiff’s mother lived together as husband and wife; they were considered and accepted as such in the community; he held her up publicly and constantly during all that time as his wife; they visited respectable families and had their visits returned; they publicly acknowledged and treated plaintiff as their child and plaintiff and her mother bore his name; they publicly reared and educated plaintiff as their child; they were visited by members of the families of both; Jim Rowland’s father and mother made extended visits annually in their home; it was the understanding of all that they were married; in every conceivable aspect Jim Rowland and plaintiff’s mother constantly and unequivocally possessed the status of marriage.
“When plaintiff’s mother died there was cut from the third finger of her left hand a plain gold wedding band or ring. This has been preserved in plaintiff’s possession and was exhibited in court. Shortly after her death Jim Rowland caused to be erected over her grave in a Little Rock cemetery a monument bearing the inscription:
“ ‘Laura E.
Beloved Wife of
J. H. Rowland
Born Feb. 6, 1870
Died Dec. 25, 1899
Blessed are the Dead That
Die in the Lord.’
“The family was considered a part of the community life of Little Rock, sufficient to prompt not a mere routine reference to her death, but an extended item, in the Little Rock Gazette, picturing a devoted family and indicative of great public respect, it follows:
“ ‘While everyone else in Little Rock and elsewhere was eating their Christmas dinner yesterday, James H. Rowland sat bowed in grief by the body of his wife, Mrs. Laura E. Rowland, who had just died at their rooms over 523 Main Street. She died just as the Catholic Church was striking the hour of noon, and to the grief stricken husband it sounded as a death knell over the bier of his beloved wife. Mrs. Rowland had been a sufferer from that dreaded disease, tuberculosis, for several years past and the past month has been gradually growing weaker every day. She realized that death had set its seal upon her and that she could live but a few days but expressed the wish that she might be spared to enjoy Christmas Day with her husband. Her prayer was granted but when the light streaked the Eastern skies marking the arrival of the new day, the anniversary of the birth of the Christ-child, it found her barely alive. She was very cheerful and took a great delight in the presents given her by her husband.
“ ‘Strong in the belief that his wife would survive the day, the husband had the Christmas turkey and other accessories cooked and had prepared to make the last Christmas she would be in this world a happy one. But as the hour of noon drew near signs of death began to appear and the physician said she could live but a few hours. With the stroke of 12 her spirit passed into the great beyond and the sorrowing husband gave unrestrained vent to his grief. The Christmas dinner was left untouched and the undertaker invaded the household. The remains were prepared for burial and the funeral will take place at 3 o’clock this afternoon from the rooms over 523 Main Street. The interment will be in Oakland cemetery.
“ ‘Mr. Rowland is state agent for the Red Star Supply Company, with headquarters in this city, and has resided in Little Rock several years.’
“Many other pertinent facts are disclosed by the record, but further recitation is made unnecessary by the following quotations *287 from brief of defendant’s counsel on page 3:
“ ‘There is no dispute that Jim Rowland and Laura Drummond lived in Little Rock as man and wife, with the child, known by the name of Ferol Rowland, until Laura’s death in December, 1899.’ and on page 17:
“ ‘From that time (when they moved to Little Rock) until the death of Ferol’s mother in December, 1899, there can be no question whatever, and it is not disputed, that J. H. Rowland and Laura Drummond lived together as man and wife, with Ferol living in the home with them, that she went by the name of Ferol Rowland and was understood to be their child.’ Parenthesis added.
“In the early case of Holmes v. Holmes, 6 La. 463, 26 Am.Dec. 482, the Court stated:
“ ‘Cohabitation as man and wife, furnishes presumptive, evidence of a preceding marriage. It is not to be presumed that those who hold themselves out in society as man and wife, who are rearing a family of children at their domestic board, to whom the father gives his name, over whom he exercises a parent’s authority, and administers a parent’s protection and support, are living in open disregard of public morals, and that their common off-spring are bastards ; such a family is already in the possession of a civil condition or status, not to be questioned lightly and collaterally.’
“The Supreme Court has never departed from this doctrine in the many cases in which it has been called upon to consider its application, including the ones heretofore listed, and, as late as July, 1942, it was restated in Gray’s Succession, 201 La. 121, 9 So.2d 481, 483, when the Court quoted approvingly statements made formerly in other cases therein cited, and said:
“ ‘Article 952 of the Revised Civil Code provides:
“ ‘ “The incapacity of heirs is not presumed. He who alleges it must prove it.”
“ ‘In Jackson v. United Gas Public Service Co., Inc., 196 La. 1, 198 So. 633, 640, the Court, in its opinion on rehearing, quoted with approval from the Succession of Curtis, 161 La. 1045, 1051, 109 So. 832-834, as follows:
“ ‘ “ ‘The presumption in favor of marriage and the legitimacy of children is one of the strongest known to the law, and in favor of a child asserting its legitimacy this presumption applies with peculiar force.’ ”
“ ‘See, also, Succession of Kneipp, 172 La. 411, 134 So. 376; 7 C.J. 949; 10 C.J.S., Bastards, § 11.
“ ‘In the case of John Blasini et al. v. Succession of Silvestre Blasini, 30 La.Ann. 1388, the plaintiffs, as children of the first marriage of Silvestre Blasini, claimed to be forced heirs and entitled as such to their proportionate share of their father’s estate. The defendants, the widow and son by second marriage of the deceased, denied that the plaintiffs were issue of the deceased’s first marriage with Isabella Barera, and that they were legitimate children. The plaintiffs offered testimony tending to show that their deceased father had lived with their mother as husband and wife; that the children were the offspring of these parties; and that the children were treated and reared as the legitimate offspring of the couple. The defendants’ evidence tended to show that the deceased had stated on several occasions that he had not married Isabella; that there was an impediment to their marriage because she was a person of color; that he mistreated her and she was compelled to bear his mistreatment because she was not married to him; that there was no direct evidence to show that the couple had been married in Mexico; and that he had married the defendant widow within three months after the date of the death of Isabella.
“ ‘In holding that there was a presumption of marriage and legitimate descent, which had not been destroyed by the evidence offered by the defendants, the Court stated:
“ ‘ “The law will not tolerate the presumption that a man and a woman who live together, publicly, as husband and wife, are really living in concubinage in violation of the law and of public decency. From certain established facts certain legal presumptions are deduced; and where it is proven, as in this case, that the parties from the time of their first appearing together in the community in which they made their permanent domicile, publicly cohabited, assuming to be husband and wife, without separation or interruption until death intervened: that the woman bore the man’s name, and he called her his wife, and introduced her as his wife, and declared that he had married her in the land of her birth: where they present their offspring *288 to the world as their children, give them the surname of the father, have them baptized as their children, and rear, and care for, and educate them as such, the law accords to the man and the woman and to their children a legal and social status, based upon the presumption of marriage, the consequence of which is the presumption of legitimate filiation and descent, which imposes on those who assert the contrary the burden of destroying that presumption. It is not going too far to say that the entire conduct of Blasini and Isabella created, in favor of their children, a presumption of legitimate descent, which could be destroyed only by proof that they were not actually married, or that there was some legal impediment by reason of which their marriage was legally impossible.
5|c sjc Hí H*
“ ‘ “If a man or woman so circumstanced, to gratify some whim or caprice, or to accomplish some settled purpose, should deny the reputed marriage, a moral estop-pel would intervene, and forbid the falsifying of their acts and conduct by such denial.
“ ‘ “During the entire cohabitation of Blasini and Isabella they were apparently living in the observance of the obligations of the contract of marriage; and their acts and conduct are not compatible with any other theory than that they were actually married, in Mexico, before Isabella came to New Orleans. We must, therefore, regard the plaintiffs as their legitimate children, and forced heirs of their father, Silvestre Blasini. * * ’
“It is not shown, nor even claimed, that there was any legal impediment by reason of which a marriage between Jim Rowland and Laura Ellen Drummond was legally impossible and there is no proof in the record that they were not actually married. No witness testified from knowledge, that they were not; no denial, by word or deed, was ever heard or observed emanating from either of them.
“We must, therefore, presume, and we find, that Jim Rowland and Laura Ellen Drummond were, prior to their coming to Little Rock, lawfully married. Whether this marriage occurred prior to or after plaintiff's birth, we pretermit for later discussion.
“Was James H. Rowland plaintiff’s father? No record of registry of her birth or baptism is produced by plaintiff and she testifies she found none after search. But the Civil Code provides:
“Art. 193. ‘The filiation of legitimate children may be proved by a transcript from the register of birth or baptism, kept agreeably to law or to the usages of the country.’
“Art. 194. ‘If the register of births and baptisms is lost, or if no such register ha'S been kept, it suffices for the child to show that he has been constantly considered as a child born during marriage.’
“Art. 195. ‘The being considered in this capacity is proved by a sufficient collection of facts demonstrating the connection of filiation and paternity which exists between an individual and the family to which he belongs. The most material of these facts are:
“ ‘That such individual has always been called by the surname of the father from whom he pretends to be born;
“ ‘That the father treated him as his child, and that he provided as such for his education, maintenance and settlement in life;
“ ‘That he has constantly been acknowledged as such * * * within the family.’
“Art. 196. ‘If there be neither register of birth or baptism, nor this general reputation, or if the child has been registered under a false name, or as born of unknown parents, also if the child has been exposed or abandoned, or if his condition has been suppressed, the proof of his legitimate filiation may be made either by written or oral evidence.’
“Art. 197. ‘Proof against the legitimate filiation may be made by evidence that the plaintiff is not the child of the mother whom he pretends to be his, and the maternity being proved, that he is not the child of the husband of the mother.’
“The evidence heretofore discussed is likewise pertinent here. After the death of plaintiff’s mother in Little Rock on December 25, 1899, she continued to live there with J. H. Rowland in his home long enough to be included in the 1900 United States Census as Ferol Rowland, daughter of J. H. Rowland. During that census year, Mr. Rowland left Little Rock and moved to Memphis, Tennessee, taking with him plaintiff, then a little girl of about twelve years of age. There he became connected with the Red Star Furniture *289 Company. Upon arriving in Memphis, he placed in a local newspaper an advertisement that ‘a widower wanted his young daughter to board in a private home/ and did place her in the home of the parents of Edward Manker, who testified by deposition. Miss Agnes Hall, a witness by deposition, confirms this and states that she became a constant companion of plaintiff, they being about the same age. Both of these witnesses testified that Mr. Rowland was very devoted and attentive to the welfare of plaintiff, very generous in his provisions for her, that he at all times treated her as his own daughter, addressed her as such and never spoke any word or did any act inconsistent with that relationship. He enrolled her in public school there as Ferol Rowland, daughter of J. H. Rowland.
“In January, 1902, Mr. Rowland married the defendant. They moved into a home, set up housekeeping and he brought plaintiff from her boarding place into his home where she continued to live until 1905, except for summer visits in Little Rock with her maternal aunt, Mrs. Myrtle Riley, one of the witnesses in this case.
“The Court is convinced that the relationship between plaintiff and defendant developed into one of antagonism and unpleasantness. We state the fact; with the cause we are not concerned. In 1905 plaintiff, after her summer visit in Little Rock, persuaded Mr. Rowland to permit her to continue to live with her aunt. From that time on, until the death of Mr. Rowland, plaintiff never lived in his home, with the exception of a few weeks, years afterward, in Shreveport, which attempt proved unpleasant and short lived. In 1906 plaintiff married Herbert R. Riley with whom she lived in Little Rock until his death in 1937. During all the time from 1905, when she left his home, Mr. Rowland continued to generously assist plaintiff financially, visited her regularly and constantly, openly acknowledged and treated her as his own daughter. To Messrs. Philip Lieber, IT. PI. Bain, H. S. Weston, Carey P. Duncan, W. W. Campbell, witnesses, all close personal friends and Masonic coworkers, he spoke of plaintiff as his daughter by his first wife and discussed her with them. With Mr. Lieber he often visited Little Rock in order to be with her and, with him, visited in her home there, where he introduced her as his daughter. The witness, Mrs. H. S. Weston, formerly Mrs. DeGraffenried, Mr. Rowland’s private secretary from 1918 to his death in 1941, testified that he often discussed plaintiff with her, as his daughter, that plaintiff often visited him in his office in Shreveport, that he often sent plaintiff money, visited her regularly and frequently in Little Rock and wrote her many letters over the years. Many of these plaintiff says she did not keep, not suspecting she would ever be called upon to refer to them, but some she found and they are in the record. They consist of letters, telegrams and autographed photographs from Mr. Rowland to her. All are couched in terms of endearment and intimacy. In them he refers to plaintiff as ‘my daughter Ferol’, ‘my dear daughter’ and to himself as ‘Dad’ or ‘your dear old Dad,’ etc.
“In 1938 when a candidate for reelection to the Caddo Parish School Board on which he served for many years as a member and for several years as its President, he made a public statement published in the Shreveport press expressing his abiding interest in the public school system, in the course of which he said: ‘The rearing of my own daughter has kept this interest alive.’
“These established facts, unless overcome by other evidence, are, in the view of the Court, ‘a sufficient collection of facts demonstrating the connection of filiation and paternity which exists between an individual and the family to which he belongs,’ as called for in Article 195 of the Civil Code.
“Defendant’s counsel points out that several witnesses for defendant, as well as defendant herself, attributed to Mr. Rowland statements which they construed as a denial of his paternity of this plaintiff. We have considered these in the light of the circumstances under which they were allegedly made. The Court doubts that these statements, if made in the tenor as construed by the witnesses, were made by the deceased deliberately and with the intention of denying his paternity of this plaintiff and thus bastardizing her. Besides, such statements as were attributed to him, if made, could not be permitted to belie the entire history of fifty years of his public, constant and consistent affirmation that this plaintiff was his own daughter.
“Reference is also made to a will which defendant says she and her husband, J. H. Rowland, made jointly on April 10, 1938, copy of which is in evidence as Defendant’s Exhibit D-26. Defendant’s counsel emphasizes that, in this will, there is no *290 reference to plaintiff being his daughter and that she is only remembered therein by a special legacy of $1,000. If this will, the original of which was, according to defendant’s testimony, delivered to Mr. Rowland by her, had been permitted by him to remain extant under circumstances indicating that he wished it probated and executed after his demise as his last will and testament, it might then have been entitled to some weight quoad the question of paternity and filiation.
“But we must conclude that Mr. Rowland destroyed this will, since it was not in his effects, and thus revoked and repudiated it as not expressing his desires and will. It is shown by defendant’s testimony that she had several times tried to prevail upon the deceased to make a will, which except for this one occasion, he declined and refused to do. And this will was written by defendant herself (Evidence p. ' 326) when, to quote her (Evidence p. 323), ‘it was after I recovered in 1938. I had been very, very ill, practically near death with malaria. * * * I was just able to walk one Sunday. * * *’ The defendant, her niece, her brother and her sister testify that they heard the deceased explain his refusal to make a will by asserting that it was unnecessary and saying to defendant, 'There is just the two of us and if I die it is yours and if you die it is mine.’ On the other hand, disinterested witnesses for plaintiff testify that they heard the deceased say that he had no will, because ‘of the fact that the laws of Louisiana were so fair and just that Ferol would receive his half of the estate should he pass on before she did.’ The latter declaration, it seems to the Court, consists with the acts and conduct of deceased and, we think, represents the real reason for his intestacy.
“We have thus far discussed the question of deceased’s paternity of plaintiff in the light of his acts, conduct and declarations, for, after all, he alone could know that he was not her father. In this light we have considered the evidence concerning the events surrounding plaintiff’s birth. It is here, as we indicated early in this opinion, that we find much confusion and conflict. Here again we shall state the material facts, as we consider them proved, discussing as briefly as we may, the mass of testimony.
“James H. Rowland lived with his parents in Jamesport, Daviess County, Missouri, a small town of six or seven hundred inhabitants, from 1881 to 1885, when he went to Kansas City to work. He was then around 19 or 20 years old. During this same time the parents of Laura Ellen Drummond also lived in Jamesport. When Jim Rowland left in 1885, Laura Ellen was fifteen or sixteen years old. The two families were acquainted and we conclude that Jim and Laura Ellen were, also. A number of Laura Ellen’s relatives were farm folk and lived in the country between Jamesport and Gallatin, the county seat of Daviess County. Gallatin was ten miles southwest of Jamesport. During his years in Jamesport, Jim Rowland did farm work on surrounding farms. Laura Ellen’s mother died about 1887 and the children were scattered around among various relatives, Laura Ellen living some with her Aunt Nancy Drummond, some with an Uncle Ben Brooks and others, living in the Goodbar Community near Gallatin.
“About 1886 the parents of Jim Rowland moved to Cameron, Missouri, a small town, also in Daviess County, slightly larger than Jamesport,- about thirty miles southwest of Jamesport and about twenty miles southwest of Gallatin. These three towns were connected by a direct rail line. Jim Rowland, following an illness or injury in Kansas City in 1885, rejoined his family.
“The substance of the testimony of plaintiff’s witnesses, plaintiff’s Drummond relatives, is that sometime in the Fall of 1887, Laura Ellen Drummond, shortly after her mother’s death, left the home of a relative, with whom she was staying in the country, to meet Jim Rowland in Gallatin, Missouri, to be married; that they returned some days later and said they were married, but none of the witnesses knew where it occurred; that, in the following Spring, plaintiff was born to them in St. Joseph, Missouri; that thereafter Jim Rowland, Laura Ellen and the child, Ferol, visited in the homes of these relatives as husband and wife and child, plaintiff’s 81 year old Aunt, Nancy Drummond, testifying (by deposition) that ‘he was a poor man that did odd jobs and traveled some as a salesman and had a hard time to get a start when they were first married, so Laura and Ferol stayed with her folks a part of the time after her marriage.’
“On the other hand, a number of witnesses for defendant testified that, from 1886, when Jim Rowland rejoined his family in Cameron, Missouri, until 1892, when the Rowland family moved to St. Louis, Missouri, he continued to live in Cameron; *291 that except for one occasion of two weeks when he was not in or near Jamesport, he never left Cameron for so much as a day. From this it is argued that it was impossible for Jim Rowland to have married and lived with Laura Ellen Drummond and to have been the father of her child, Ferol, as testified by plaintiff’s witnesses.
“To this effect was the testimony of Mrs. Frances Grupe, a sister of J. H. Rowland, although she signed a statement (Exhibit P. 28) in her home in Chicago which she gave to Mr. Elmo P. Lee, Jr., one of plaintiff’s counsel, containing the following:
“ T am a younger sister of J. H. Rowland, deceased. My brother J. H. left home when young. When Ferol Rowland, now Mrs. Cameron, was several years of age, J. H. came to St. Louis, Mo., with a wife, Laura Ellen Rowland, born Drum-mond, and a child, Ferol Rowland. It was generally understood in my family that Ferol was 2 or 3 years old when J. H. married Laura Ellen. However, I do not know this of my own knowledge as J. H. never told me that Ferol was not his child or that she was born prior to his marriage to Laura Ellen Rowland. However, my older brother William, now deceased, and my parents told me that Ferol was several years old when J. H. married Laura Ellen Rowland. J. H. was away from home most of the time and could have married Laura Ellen and had the child Ferol as issue of the marriage without my knowing it.’
“At the trial this witness denied making the statement, but the Court has no doubt that she gave the statement and signed the same as it appears in the record and as quoted.
“Our consideration of the evidence on this point leaves us with the conviction that the concluding sentence of Mrs. Grupe’s quoted statement represents the extent of the knowledge of the living members of the Rowland family and residents of Cameron who testified in the case, that is, that J. H. Rowland was away from home most of the time and could have married Laura Ellen and had the child Ferol without their knowing it. It is not without significance to the Court that Mrs. Ben Ogden, sister of J. H. Rowland, testified (Evidence p. 279) that while in Cameron she never heard of her brother Jim ever dating a girl and, although ‘he was interested in a young lady at the hotel, very much, and admired her very much, but I never saw them out together — not once.’
“Several witnesses for the defense testified that it was rumored and gossiped in Jamesport that Laura Ellen was unmarried during her pregnancy and for some years after plaintiff’s birth and that Jim Rowland’s name was not mentioned in connection therewith, but several other young men’s names were. However, one of defendant’s witnesses, Joseph Goodbar, testified that he had always understood that the child’s father’s name was Rowland. Gossip and rumor, if it may be dignified by being called evidence, is of the weakest sort. Especially so here, where at least three other young men are mentioned in the testimony of these witnesses. We attach very little weight to such evidence as tending to prove that J. H. Rowland was not the father of this plaintiff. As pointed out by the Supreme Court in one case, it takes more than mere rumor and gossip to destroy and overcome the presumption of legitimate filiation.
“The implication of this gossip that someone other than Jim Rowland was the father of this plaintiff is wholly inconsistent with his later living with Laura Ellen Drum-mond and plaintiff in the status of husband and father, as the evidence abundantly establishes. We are unable to accept the explanation offered by defendant’s counsel on page 41 of brief, as follows:
“ ‘The only reason which we can assign for J. H. Rowland having lived with Laura Drummond as man and wife, with her child Ferol in the household, in Little Rock from 1893 until her death in 1899, may possibly best be summed up in the words “human nature” plus the fact that J. H. Rowland had an ardent love and devotion to little children throughout his life. The record shows that J. H. Rowland was traveling with his brother William when they met Laura Drummond and her child, with her Aunt Myrtle, in Iowa in 1892, when the child was four years old. This is the first time any member of the Rowland family ever heard their brother Jim’s name in connection with Laura Drummond. It is evident that the fatherless child attracted Jim Rowland and resulted .in their going to Little Rock to live in the following year. It was apparent that they made some nice friends and he was getting along well, and naturally they were not stating to the public that they were living together unmarried.’
“In the first place, it is not in accord with, but contrary to, ‘human nature’ for *292 a young man twenty-six years of age, as Jim Rowland was in 1892, and knowing, as he surely knew, if he was not the father of the child, to enter knowingly into a status of matrimony with the mother of a bastard child. Such magnaminity and charity may be conceivable, but it is so improbable that it would require much more than mere conjecture to accept as a fact.
“In the second place, to assume that 'they were living together unmarried’ in open disregard of public morals and public decency, is to indulge in a presumption which, our Supreme Court has said many times, the law will not tolerate.
“In the third place, there is no reasonable explanation of the very unusual coincidence, if, indeed, it was a coincidence, of Laura Drummond, her child and sister chancing to meet Jim Rowland in Iowa.
“Again it is argued that the deceased could not have been the father of plaintiff, because he was impotent. There is no evidence in the record to support such a contention. The evidence proffered on this point was the rankest hearsay and, on proper objection, was excluded.
“In this connection we may well conclude that, notwithstanding some opinions to the contrary, it was the opinion of most of the witnesses that this plaintiff bears a strong resemblance to the deceased, J. H. Rowland. This was the opinion expressed by the witnesses, Mrs. Julia Judd, Mrs. Ruth Osborn, Miss Agnes Hall, Mrs. H. S. Weston and Messrs. Philip Lieber, H. S. Weston and W. W. Campbell. A number of the witnesses in their testimony also observed a noticeable resemblance between plaintiff and J. H. Rowland’s sister, Mrs. Ogden. The Court observed the two together in the courtroom during the trial and .was likewise impressed with the strong resemblance between them.
“We do not doubt, after a careful consideration of all the evidence, that J. H. Rowland was plaintiff’s father, and we so find.
“This brings us to the third inquiry, ‘Is this plaintiff the heir of James H. Rowland?’ From the views already expressed, the answer must be in the affirmative. Under the jurisprudence heretofore discussed we think the evidence impels us to hold that the marriage between J. H. Rowland and Laura Ellen Drummond occurred prior to plaintiff’s birth and that plaintiff is the legitimate issue thereof.
“The presumption of marriage and legitimate filiation is one of the strongest known to the law, and in favor of a child asserting its legitimacy this presumption applies with peculiar force. The Supreme Court, in Succession of Curtis, 161 La. 1045, 109 So. 832, [834], so held and quoted approvingly this further proposition:
“ ‘The presumption of legitimacy is a constant presumption, and is to have weight and influence throughout the investigation, the weight of the presumption increasing with lapse of time,’ and added,
“ ‘The doctrine * * * is applied in every jurisdiction in this country, and it is therefore clear that he who questions the legitimacy of children must prove the facts necessary to sustain his contention.’
“In the Succession of Anderson, 176 La. 66, 145 So. 270, 275, the Court said:
“ ‘Not only may a child show its legitimacy by establishing the marriage by general reputation to which it traces, but it may also create the presumption that it was born during or as a result of marriage, and is therefore legitimate, by proving legitimate filiation as prescribed by articles 193, 194 and 195 of the Civil Code. As was said in Boykin v. Jenkins, 174 La. 335, 140 So. 495, 497:
“ ‘ “A presumption of legitimacy arises also from proof of legitimate filiation. The Code (article 193 et seq.) prescribes the methods of proving legitimate filiation. It may be proved by a transcript from the register of birth or baptism.
“ ‘ “ ‘If the register of births and baptisms is lost, or if no such register has been kept, it suffices for the child to show that he has been constantly considered as a child born during marriage.’ Civ.Code, art. 194.
“ ‘ “The following article of the Code (article 195) provides that whether a child has been considered born during a marriage may be proved by a collection of facts ‘demonstrating the connection of filiation and paternity which exists between an individual and the family to which he belongs,’ the most material of which facts are: ‘That such individual has always been called by the surname of the father from whom he pretends to be born; that *293 the father treated him as his child, and that he provided as such for his education, maintenance and settlement in life; that he has constantly been acknowledged as such in the world; that he has been acknowledged as such within the family.’
“ ‘ “The making of such proof raises the presumption that the child was born during or as a result of marriage, and is therefore legitimate.” ’
“This view seems to prevail in France, Marcade, in commenting on Article 197 of the French Civil Code, which is not out of accord with our Article 195, in interpreting the expression ‘general reputation’ found in that article, says:
“ ‘This general reputation is defined thus: The status resulting from the notoriety produced by a cumulation of facts all tending to prove the quality that a person enjoys in a family and in society. For the wife and for the child, it results from three elements-: Nomen, tractus, and fama; nomen, having borne the name of the husband or of the'father; tractus, having been treated as a wife or as a legitimate child in the home and in the family; fama, having been respected as such in the eyes of the world.’
“Our holding that plaintiff is the legitimate child and heir of J. H. Rowland is not only supported by one of the strongest of legal presumptions, but it is wholly and entirely consistent with the acts, conduct and declarations which we haVe set forth at length.
“For the reasons thus assigned, there is judgment for plaintiff as prayed for.
“James U. Galloway
“Judge.”
The record discloses that the deceased, who at the time of his d~ath was advanced in years, lived a clean, upright, and honorable life, and that he enjoyed the confidence, respect, and admiration of his fellowman in all of his relations and associations with them., The single exception is the charge in the instant case, made after his death, of moral misconduct on his part. We are thoroughly in accord with the conclusion reached by our learned brother below that testimony predicated on rumors and gossip of the distant past is not sufficient to overcome and outweigh the positive evidence of consistent decent and moral living by the deceased and his first wife throughout their lives. The testimony based on rumors and gossip is further weakened by the fact that it is conflicting and has been brought forward when the parties involved are no longer here to ■defend themselves.
The judgment of the district court is affirmed, at appellant’s costs.