**CAMERON v. ROWLAND (WILSON, Intervener).**

No. 38556.

Jan. 15, 1948.

On Rehearing Feb. 14, 1949.

Rehearing Denied March 21, 1949.

Freyer, Goode, Nelson & Freyer and Booth, Lockard & Jack, all of Shreveport, for defendant-appellant.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, for intervener.

Cook, Clark & Egan, of Shreveport, for plaintiff-appellee.

HAMITER, Justice.

In a former proceeding, to which this is a sequel, judgment was rendered in favor of plaintiff, Mrs. Ferol R. Cameron, decreeing her to be the legitimate daughter of James H. Rowland (who died intestate on June 12, 1941) by his first wife, and entitled, as his sole heir, to the ownership and possession of her father's one-half interest in the community of acquets and gains that existed between him and his second wife, Mrs. Louise T. Rowland, who is the defendant herein. The judgment further ordered Mrs. Rowland to account to plaintiff for all properties thus inherited, together with the revenues therefrom. Cameron v. Rowland, 208 La. 663, 23 So.2d 283.

On the finality of that judgment, and pursuant thereto, an account was filed by Mrs. Rowland, it listing various properties, including cash, stocks and real estate, as belonging to the community.

Thereafter, the instant proceeding was commenced by Mrs. Cameron, she demanding in it a further accounting from Mrs. Rowland for other properties allegedly belonging to the community, together with rents and revenues therefrom. These are two automobiles and the household effects, in the possession of defendant at the time of Mr. Rowland's death, and also certain bank accounts, some savings and loan association stock, and five pieces of real estate, all of which stood in Mrs. Rowland's name. Answering, defendant denied that the community had any interest therein; she averred that all belonged to her separate estate, except three pieces of real estate owned by her sister, Mrs. Carrie T. Wilson.

In reconvention, Mrs. Rowland asked judgment for various sums allegedly advanced by her from her separate estate and used for the benefit of the community and Mr. Rowland.

Intervening in the proceeding was Mrs. Carrie T. Wilson, she claiming to be the owner of three of the disputed five pieces of real estate (as averred by defendant) and praying for judgment against plaintiff and defendant recognizing her as such owner. Among other things, Mrs. Wilson alleged:

"* * * The title to said property was taken in defendant's name, instead of intervenor's merely for convenience. In truth and fact, however, all of the funds used by defendant to pay the purchase prices for said property, including both the

cash and credit portions thereof, were funds belonging to intervenor; and it was intended that intervenor own said property, defendant holding title in her name as agent and attorney-in-fact for intervenor."

After trial there was judgment decreeing that the hereinafter mentioned properties belonged to the community that existed between Mr. Rowland and defendant, and, therefore, recognizing plaintiff to be the owner (and entitled to the possession) of an undivided one-half interest therein, together with one-half of all rents, revenues and income therefrom since June 12, 1941 (date of Mr. Rowland's death), viz.:

1. Credit balance of $5098.89 (as of June 12, 1941) in savings account No. B–3981, standing in the name of Mrs. Louise T. Rowland, at the Commercial National Bank in Shreveport.

2. One 1940 model Buick automobile.

3. One Hudson Terraplane automobile.

4. Household furnishings situated in decedent's home at the time of his death.

5. 40 shares of paid-up stock of the First Federal Savings and Loan Association of Shreveport, having a par value of $100 each (a total of $4000), standing on the books of the Association, as of June 12, 1941, in the name of Mrs. Rowland.

6. 60 savings shares of the First Federal Savings and Loan Association of Shreveport, registered in the name of Mrs. Rowland as of June 12, 1941, having a total value then of $5515.14.

7. The disputed five pieces of real estate standing in the name of Mrs. Rowland, the ownership of three of which is asserted by intervenor, Mrs. Carrie T. Wilson.

8. Small credit balance (amount not disclosed) in Mrs. Rowland's account at Texas Avenue Branch of the First National Bank of Shreveport.

Further, the judgment rejected plaintiff's demands for one-half of the credit balance of $7935.02 (as of June 12, 1941) in account No. 22320, standing in the name of Mr. or Mrs. J. H. Rowland, at the Continental-American Bank & Trust Company of Shreveport, this item having previously been accounted for by the defendant.

Additionally, the judgment recited: "It is further ordered, adjudged and decreed that in accounting for any funds as hereinabove ordered, the defendant is authorized and permitted to credit against the gross amount of the rents, revenues and income, any expense incurred and paid by the defendant in the preservation and handling of the property since June 12, 1941, and without limiting this general authority, she is permitted to credit herself with any taxes against the property itself, repairs or insurance, and in addition thereto she may further credit one-half of the sum of $691.37, being one-half of the community debts paid by her after the death of James H. Rowland, and she may further credit the full sum of $1,204.25, being the funeral expenses of the said James H. Rowland,

shown to have been paid by her after his death.

"It is further ordered, adjudged and decreed that the demands of the defendant in reconvention, other than as herein expressly allowed, are dismissed.

"It is further ordered, adjudged and decreed that the demands of Mrs. Carrie Wilson, the intervenor herein, be rejected.

"The rights of the plaintiff to a further accounting for any additional property not specifically covered by this judgment, are reserved to her.

"Defendant to pay all costs of the main demand and of her reconventional demand; the intervenor to pay the costs of the intervention."

Both the defendant and the intervenor appealed, they complaining here of the judgment in so far as it adversely affects them. Plaintiff neither appealed nor answered the appeals of the other litigants, and hence, she can obtain no revision of the judgment.

The appeals present largely issues of fact, for as before shown the action involves primarily a matter of accounting between the surviving widow in community of the second marriage and the sole heir of the deceased husband by his first marriage; however, in determining those issues certain principles of law must be considered. And the main question to be decided is, "Did the property in dispute belong to the community?"

The defendant and Mr. Rowland were married in Memphis, Tennessee, on January 22, 1902, and there maintained their home until about November, 1907, when they moved to Shreveport. In that city thereafter they lived together until Mr. Rowland's death on June 12, 1941.

On January 15, 1908, some two months after the establishing of their domicile in Shreveport, a checking account was commenced in the name of Mrs. Louise Rowland in the Commercial National Bank of Shreveport. From then until July 30, 1909, a total of $611 was deposited in it and $200.-07 withdrawn therefrom. On the last named date that account was closed, and the balance then existing of $410.93 was transferred, as the opening deposit, to savings account No. B–3981 in the name of Mrs. Louise Rowland at the same bank. This savings account continued until Mr. Rowland's death at which time it contained a credit balance of $5098.89. The defendant made no accounting to plaintiff respecting that balance, and she claims it herein as her separate and paraphernal funds. Savings account No. B–3981 is otherwise important to consider in this litigation, for from it, during the existence of the community, came numerous funds that were used in acquiring other disputed assets, particularly the five pieces of real estate.

In his endeavor to determine the character of the property in dispute—that is whether it belonged to the community or to defendant's separate estate—the dis-

trict judge first recognized, as his well considered written reasons for judgment disclose, that the regime of the community of acquets and gains between Mr. and Mrs. Rowland was established at the time of their removal to Shreveport in November, 1907. Civil Code, Article 2401, sustains this recognition, it reading:

"A marriage, contracted out of this State, between persons who afterwards come here to live, is also subjected to community of acquets, with respect to such property as is acquired after their arrival."

See also Fleming et al. v. Fleming, 211 La. 860, 30 So.2d 860.

Next, he observed that the following legal principles obtain in this state and are relevant to this controversy:

"This partnership or community consists of the profits of all the effects of which the husband has the administration and enjoyment, either of right or in fact, of the produce of the reciprocal industry and labor of both husband and wife, and of the estate which they may acquire during the marriage, either by donations made jointly to them both, or by purchase, or in any other similar way, even although the purchase be only in the name of one of the two and not of both, because in that case the period of time when the purchase is made is alone attended to, and not the person who made the purchase. * * *" Civil Code, Article 2402.

"At the time of the dissolution of the marriage, all effects which both husband and wife reciprocally possess, are presumed common effects or gains, unless it be satisfactorily proved which of such effects they brought in marriage, or which have been given them separately, or which they have respectively inherited." Civil Code, Article 2405.

"This presumption is so great that, in the language of the Code (Article 2287), it dispenses with all other proof in favor of him for whom it exists, and it can only be rebutted by evidence of the clearest character." Succession of Manning, 150 La. 1008, 91 So. 435, 436.

"The legal presumption in favor of the community dispenses those claiming community rights or asserting community obligations from other proof, and it is incumbent on those denying the community and asserting the property or funds to be the separate estate of the wife to prove affirmatively and satisfactorily that the same is hers." Succession of Manning, 107 La. 456, 457, 31 So. 862.

Then the district judge announced: "The presumption is, therefore, that the property in dispute is community property and the burden rests upon defendant, who denies it, to prove affirmatively and satisfactorily that the same is hers. And this requires, said the Supreme Court in the Manning case first above cited, 'evidence of the clearest character.'"

After making this announcement, and in determining whether the defendant had

produced the requisite proof to rebut the legal presumption in favor of the community, he first proceeded to, and did ably, analyze the evidence as it relates to the original checking account of Mrs. Rowland (opened January 15, 1908, and closed July 30, 1909) in the Commercial National Bank of Shreveport and to her savings account No. B–3981 (opened July 30, 1909) in the same bank. Regarding such evidence, as well as the mentioned two bank accounts, he said:

"Defendant testified that she had, in cash and investments, 'around $10,000' when she married Mr. Rowland, accumulated by her as follows: $454.50 in savings from her earnings beginning when she was five years of age and accumulated when she graduated from Normal in 1893; $900 salary received from her brother (now deceased) during 1894; $3500 realized from gifts from a fiance who died in 1895 a short time before they were to be married; $475, representing 10 months salary teaching school in 1895 and 1896; $1300, a sum realized from a bet of $13 on a horse race in Memphis in 1897, her horse winning at odds of 100 to 1; $1000, received in 1899 for nursing and staying with a sister who was ill; and $2350.50 as earnings for work with Memphis concerns and stores in Memphis through 1901. No independent corroborating evidence is presented to support these amounts. No bank records sustain them. Although Mrs. Rowland had two bank accounts in Memphis when she married, the records thereof presented by her give little or no assistance. In fact she testified she kept most of her money in a lock box and put very little in banks because of a fear of them. The two accounts referred to were in the Continental Savings Bank and Manhattan Savings Bank and Trust Co., of Memphis, Tennessee. Nothing is left of the bank book of the first named bank, the leaves upon which the entries were made being all torn out and returned to Memphis after that bank failed in 1910. A Manhattan Bank book, introduced in evidence, shows little more. Most of the pages from it are torn out and are missing. This bank book shows no balance of a prior date nearer than Sept. 15, 1900, at which time the balance was $201.51. There follows entries showing deposits through December 31, 1901, which, with the $201.51, total $537.03, but the book does not show withdrawals.

"We find no documentary or other independent corroborating evidence to establish or identify the investments referred to by defendant in her testimony as owned by her when she was married.

"After her marriage to Mr. Rowland, in January 1902, there is no evidence that she was employed or engaged in any business. He was employed and earning as long as they remained in Memphis until October or November, 1907. During this period defendant testified she received $200 as a wedding gift from her sister.

It was not deposited and her testimony is otherwise uncorroborated. Defendant testified that her sister, whom she had nursed, died on October 1, 1903, and that 'she had taken out a life insurance policy in Dallas for me and I got that, *a few* thousand dollars insurance policy,' and, from this same sister 'eight hundred dollars worth of stock with coupons attached to it.' The insurance company is not identified, nor is the corporation, and this testimony is otherwise uncorroborated. Defendant likewise testified that her father died on June 25, 1903, and that she received $800 from his estate. Copies of the proceedings in her father's succession, filed in evidence, indicates she received not more than $204.78.

"Although, as we have pointed out, the regime of this community was established in Louisiana, about November, 1907, our preceding comments on the evidence are, to say the least, pertinent to that date. And, coming now to the crucial date of November, 1907, we refer again to the bank books of the two Memphis banks and finding that neither one gives any evidence on the amount of balance, if any, on deposit on that date. As we have pointed out, nothing at all is shown by the cover of the Continental Bank book, the leaves having been extracted. In the Manhattan Bank book, all leaves containing entries after December 31, 1901, and up to March 3, 1909, are missing. This book is in evidence as Rowland

Exhibit 3. Defendant does not undertake to testify as to how much her balance in either of these banks was in November, 1907. Thus, the record is barren of any proof on this point.

"On January 15, 1908, very shortly after coming to Shreveport, an open checking account was opened in the Commercial National Bank, Shreveport, Louisiana, in the name of Mrs. Louise Rowland (Ex. Rowland 90). Up to July 26, 1909, $611 was deposited in this account and checks totaling $200.07 were drawn against it, leaving a balance on that date of $410.03. Pressed for an explanation (Ev. 204), she was unable to give the source or origin of the respective deposits except that they represented moneys 'from Memphis.' Concerning the largest single deposit, $395 on May 29, 1909, she testified:

" 'To my knowledge, it is payment on that Continental.' "

"We have already pointed out that the Continental Bank in Memphis, referred to by her, went into receivership in 1910. Thereafter the Manhattan Bank of Memphis collected for her two payments, or dividends, from the liquidation. One on March 8, 1911, for $189.66, and another on June 12, 1911, for $189.66, each representing a 30% dividend, are shown on Exhibit Rowland #5, being a statement rendered her by the Manhattan Bank. Defendant's testimony that the $395 deposited in the Shreveport bank on May 29, 1909,

represented 'payments on that Continental' is incorrect.

"The presumption of law is that these deposits in the Commercial National Bank were community funds. The onus is on defendant to rebut this and to show that they were her separate property. The evidence presented lacks that degree of certainty and positiveness necessary to convince the mind. We must, therefore, hold that the funds in this account were community funds.

"This account was closed out and the balance of $410.93 transferred, as the opening deposit on July 30, 1909, to a savings account in the Commercial National Bank, Shreveport, in the name of Mrs. Louise Rowland, and being account No. 3981, in evidence as Exhibit Rowland #91. This account was maintained until Mr. Rowland's death at which time it had a balance of $5098.89. This is a bank account for which defendant failed to account, claiming it as her separate funds. Out of this account came the payments, in whole or in part, on the real estate in dispute. The account is contained in 18 different books covering 32 years and bearing many hundreds of entries of many thousands of dollars. Defendant's testimony on cross examination concerning this account consumes more than 50 pages, beginning at page 202 of Volume 11 of the evidence. Any additional discussion thereof would be impractical here. We have considered it carefully and it suffices to say that defendant was unable to give any specific information about the source or origin of most of the deposits. Opposite some of the deposit entries are certain memoranda which defendant says she wrote at the time of the deposits, such as 'Memphis,' 'Note,' etc., but in most of these cases she was unable to give any information on the transaction from which the deposit came. For example, after having testified that a deposit of $355 came 'from Memphis' she was then asked about a following deposit entry, as follows:

" 'Q. Where did you get that fifty-five dollars? A. The same place. I can't specify just exactly where. I can't specify on what investment it was, but I was getting money from different sources there and I kept no books. And Mr. Rowland had no money.'

"Again, at page 219 of the evidence,

" 'Q. Just a minute, if you don't mind. Deposit of Seventy-five ($75.00) Dollars at that time, can you account for that? A. December what?

" 'Q. December 29, 1910. A. Oh, that is the note I would get Seventy-five dollars from.

" 'Q. Which note was that now? A. That was one I would get from Memphis. I had many of them.

" 'Q. I ask you which one. A. I don't remember.

" 'Q. Can you name the maker of the note? A. No, sir, I can't. It has been so long I have forgotten who it is.'

"On page 231, testifying concerning another notation of the 'Note and interest,' we find:

" 'Q. Do you know what note? A. It says "Note and interest." No, it is one of those notes I got, Mr. Cook. I just tried to explain to you. I had a list that I kept years ago, but I didn't keep it after I didn't need it anymore.'

"These excerpts are typical. Again and again we find defendant giving answers to the same effect. The memoranda or notations in the books, self-serving and unexplained as they are, are mere reiterations of defendant's testimony and afford no independent corroboration thereof.

"We have already held that this account was started with a deposit of community funds. It is our opinion that the evidence produced by defendant as to the funds subsequently deposited therein falls far short of that degree of certainty and positiveness necessary to specially prove, as C.C. Article 2405 requires, that these funds were defendant's separate property. Admitting arguendo, that defendant had accumulated some savings from antenuptial earnings and acquisitions (and we have heretofore pointed out the unsatisfactory character of the evidence on that point), we are not permitted to presume that that was the origin of the funds deposited in this account after the community had been established and for many years thereafter.

"In Succession of Manning, 107 La. 456, 459, 31 So. 862, cited supra, the Supreme Court said:

" 'The fact that the wife had $800, antenuptial earnings, at the time of her marriage, does not even suffice to raise a presumption that any part of it went to make up the deposits with Schmidt & Zeigler begun more than a dozen years later.'

"We hold that this account was property of the community and defendant is bound to account to plaintiff for one-half of the $5098.89, the balance therein at the time of Mr. Rowland's death."

█ With this conclusion we are unable to disagree. The legal principles followed and applied (relative to the community presumption and the proof required to overcome it) have been reaffirmed by comparatively recent decisions of this court. Thus, in Succession of McMahon, 176 La. 63, 145 So. 269, it is said:

"The presumption is that all property acquired during the existence of the community belongs to the community, although the purchase be in the name of the wife only. Civ.Code, arts. 2402, 2405. To rebut this presumption, the wife must show with legal certainty: First, that the funds constituting the price paid for the property, were her paraphernal funds; secondly, that they were administered by her; and, thirdly, that they were invested by her."

And in Montgomery v. Bouanchaud, 179 La. 312, 154 So. 8, 9, the following comment is found:

"The law presumes that property purchased during marriage is community property. This presumption, when the wife claims the property, can be rebutted only by clear, positive, and convincing evidence, * * *."

█ Whether Mrs. Rowland has successfully rebutted the presumption of community, with reference to her savings account No. B–3981, is a question the correct answer to which depends on the weight to be attached to the evidence. We have carefully studied the voluminous transcript of testimony of the several witnesses (it consuming some 600 pages) and have closely scrutinized the numerous exhibits (more than 100) contained in the record. This thorough consideration, however, has not satisfied us that the district judge committed error in his weighing of the evidence and in holding that the presumption has not been overcome. We find, as did he, that the evidence contains many inaccuracies and discrepancies, is generally indefinite and unsatisfactory, and it lacks that degree of certainty and positiveness necessary to convince the mind.

█ Likewise, it was properly held, we think, that both of the disputed automobiles belonged to the community. The Hudson Terraplane was bought in 1935, during the existence of the community, and the evidence does not clearly disclose that separate funds were used in making the purchase. In acquiring the Buick in 1939, for a total consideration of $1150, an old car of Mr. Rowland's was traded in and a check for $800, drawn on an admittedly community account, was given.

█ Practically all of the household effects in the home at the time of Mr. Rowland's death were acquired after the establishment of the matrimonial domicile in Shreveport. Mrs. Rowland claims these as the property of her separate estate, testifying that some were purchased with her separate funds and others donated to her by Mr. Rowland. Her testimony is somewhat indefinite and also not effectively corroborated; hence, we are unable to say that the district court erred in holding that the community presumption had not been rebutted. See Succession of Coste, 43 La.Ann. 144, 9 So. 62.

Next, we consider the disputed shares of stock. At the time of Mr. Rowland's death on June 12, 1941, there stood in the name of Mrs. Louise T. Rowland eight certificates evidencing 40 shares of paid-up stock (total value of $4000) of the First Federal Savings & Loan Association, a corporation organized and operating under the laws of the United States. These certificates, dated February 25, 1935, were a re-issue of certificates of that corporation's predecessor, the Shreveport Mutual Building Association (a Louisiana corporation), which had been paid for in 1930. Also there was in Mrs. Rowland's name on June

12, 1941, 60 savings shares of the First Federal Savings & Loan Association valued at $5515.14. They, being cumulative, were acquired over a period of years, the first having been obtained from the Shreveport Mutual Building Association in 1914. According to the evidence all of the funds used for these investments, both the paid-up stock and the savings shares, came from savings account No. B–3981, above shown to belong to the community, and also from a checking account made up principally of funds transferred from that savings account.

But, notwithstanding the community character of the funds so used, defense counsel contend that such investment is the property of the separate estate of Mrs. Rowland by reason of the provisions of Act No. 140 of 1932. They particularly rely on Section 34 of that statute which provides that married women may subscribe for, own, hold, withdraw, transfer, surrender, etc., shares in building and loan associations, without the consent or authorization of their husbands, and "same shall be for the wife's or widow's separate benefit as paraphernal property, and, during the marriage as well as after the dissolution thereof, shall not form part of the marital community or of the estate of the husband for any purpose. In all cases in which, at the time of the enactment of the present statute any husband, heir, creditor, or other person or party in interest, or any building and loan association, claims or pretends or believes that the said husband, or his heirs, or creditors, or any other party or parties in interest, have any interest or ownership or claim whatsoever, adverse to the wife's or widow's interest in and to any building and loan association shares in the name of said wife and widow, suit to have said ownership and interest declared and recognized must be instituted by such party or parties or association within a delay of ninety days from the date when the present statute shall go into effect, and, in the absence of such a suit, filed within said delay, the ownership of said wife or widow in and to said shares shall be and remain absolutely incontestable; and the present statutory period of prescription and repose shall run and operate against all persons whomsoever, including minors, interdicts, married women, and the State of Louisiana." In rejecting the contention thus made, the district judge declared Section 34 of Act No. 140 of 1932 unconstitutional (as specially pleaded by plaintiff's counsel) insofar as it may be construed to deprive plaintiff, or her author in title, of the stock in question, he being of the opinion that a construction of that kind would result in the divesting of vested rights and a denial of due process.

We find no need for considering the question of the constitutionality of the mentioned statutory provision, for it appears to be inapplicable to the instant cause. The plaintiff herein was without right or interest to contest Mrs. Rowland's claimed

separate ownership of the stock until the death of her father on June 12, 1941, Maxwell v. Maxwell, 180 La. 35, 156 So. 166 and Jeansonne v. Jeansonne, 187 La. 939, 175 So. 626; and when that right came into existence the entire investment was with the First Federal Savings & Loan Association and governed by the provisions of Act No. 95 of 1940 (relating to Federal Savings & Loan Associations), Section 2 of which then read:

"That married women may subscribe for, hold, withdraw, transfer, pledge, borrow upon and surrender shares in such Federal savings and loan associations without the consent or authorization of their husbands; and such shares shall be the wife's separate and paraphernal property *provided such shares were purchased with the separate and paraphernal funds of said wife,* and both during the marriage and after the dissolution thereof shall form no part of the marital community." (Italics ours.)

True, most of the shares were originally issued by the Shreveport Mutual Building & Loan Association, a Louisiana organized corporation, to which Act No. 140 of 1932 was applicable; however, on the reorganization of that Association in 1935 into the federal corporation Mrs. Rowland agreed to and accepted the re-issue of the latter's shares and became bound by the laws relating to the federal association, including Section 2 of Act No. 95 of 1940. The investment, therefore, by reason of that provision and it having been made with com-

munity funds, cannot be declared property of defendant's separate estate.

Coming now to a consideration of the disputed five pieces of real estate, all are located in the City of Shreveport and are referred to by the district judge for convenience (we shall do likewise) as the Foster Street property, the Stephens Street property, 4728 Tulsa Street, 6111 Tulsa Street, and 2700 Catherine Street. Title to each piece was taken, during the existence of the community, in the name of Mrs. Rowland, the deed reciting that the purchase was for the benefit of her separate estate and with her separate funds under her separate administration and control. Mr. Rowland joined his wife in the execution of all of the deeds. The sole contention of Mrs. Rowland herein is that the first mentioned two pieces belonged to her separate estate, she having purchased them entirely with her separate and paraphernal funds; and that she acquired the remaining three pieces for the account of, and with the money of, her sister, Mrs. Carrie T. Wilson, who has intervened in this proceeding and is claiming the ownership thereof.

Since all of such real estate was acquired during the existence of the community between Mr. and Mrs. Rowland, the presumption is that it belonged to the community; and for effectually destroying that presumption clear and positive evidence, de hors the recitals of the acts, is required. The presumption is not overcome by the declarations in the deeds that

·the wife was purchasing with paraphernal funds under her separate administration. Bachino v. Coste, 35 La.Ann. 570; Bartels v. Souchon, 48 La.Ann. 783, 19 So. 941; Reine v. Reine, 170 La. 839, 129 So. 364; Houghton v. Hall, 177 La. 237, 148 So. 37.

■ As to the Foster Street and Stephens Street properties Mrs. Rowland has not successfully rebutted the presumption of community. According to the evidence in the record both pieces were wholly paid for with funds drawn from her savings and checking accounts in the Commercial Bank of Shreveport which have heretofore been declared community accounts.

On the trial of the intervention, in which Mrs. Carrie T. Wilson claims ownership of the remaining three pieces of real estate, plaintiff's counsel objected to the introduction of evidence to show title in anyone other than the person named in the deeds. The court overruled the objection and admitted the evidence on the authority of Succession of Farley, 205 La. 972, 18 So. 2d 586. We need not decide whether that ruling was correct, for by the evidence adduced, conceding arguendo its admissibility, ownership of the property by intervenor is not satisfactorily established. In dismissing the intervention, with which conclusion we agree except with the hereinafter mentioned qualification, the district judge correctly analyzed the evidence and ably reasoned as follows:

"We repeat, it is impractical to discuss in detail all of the evidence pertinent to this phase of the case. Certain observations with reference thereto will demonstrate the reason for our conclusion that intervenor cannot recover. The recitations in the deeds themselves that Mrs. Rowland was buying with her separate and paraphernal funds and for her separate estate are, by her own testimony and answers, not correct. The evidence in the case shows clearly that the greater part of the price paid for each of the three pieces of property was paid by checks drawn and paid out of bank accounts which are admitted to be, or which we have held to be, community accounts. The purchase price of the 4728 Tulsa Street property was $2500, payable $500 cash and the balance in a $2000 mortgage to be retired in monthly installments. At the time of the purchase, Mrs. Rowland gave her check for $476.70 on the Commercial National Bank Savings Account 3981 which we have already discussed and thereafter made many payments, both on the mortgage and for expenses such as taxes and repairs, by checks drawn against that account or other accounts which we have held to be community.

"The property at 6111 Tulsa Street was purchased for $458.71 cash and the assumption of a mortgage on which there was then due approximately $1163.54. The cash payment for this property was again paid by check in the Savings Account 3981 in the Commercial National Bank, the broker's commission by a similar check

and thereafter payments were made on this purchase by checks against this same account.

"The property at 2700 Catherine Street was purchased in April, 1937, for $400 cash which was paid by a check in that amount drawn against and paid out of the Savings Account No. 3981 in the Commercial National Bank.

" * * * It is argued by intervenor that although these checks were drawn against these accounts, Mrs. Wilson had previously placed in Mrs. Rowland's hands, or someone for Mrs. Wilson had done so, more than enough money to pay for the property, if the rentals collected by Mrs. Rowland on the property purchased be included. The rentals from these three pieces of property were collected by Mrs. Rowland and deposited in the bank accounts which we have shown to be community property. In addition, as intervenor's counsel points out in his brief, many of the sums of money which Mrs. Rowland says she received from Mrs. Wilson, or from others for Mrs. Wilson, were likewise deposited in these accounts. Conceding arguendo, the receipt by Mrs. Rowland of all the amounts she says she received from or for Mrs. Wilson, the fact remains that they were commingled with community and, as we have heretofore shown, thereby lost their identity.

"In our opinion the intervenor's testimony, given in this case by deposition, of itself is insufficient to warrant a judgment for the relief sought. While she testifies that she did make some advances to Mrs. Rowland for the purpose of investments, her testimony is that she and her sister, Mrs. Rowland, 'put in money' about fifty-fifty. Speaking of the property on Catherine Street, Mrs. Wilson, testified 'my sister first purchased this property with her funds and later a partnership was arranged with her and me. My sister handled the cash and I do not recall how much I put in. My sister told me my money was invested in this property but she never told me the amount.'

"Mrs. Wilson testifies to having given to Mrs. Rowland 'several hundred dollars' prior to 1931, which was just before the purchase of the 4728 Tulsa property, and then added, 'I brought no further money with me.' She says that 'a couple of years later I turned over to my sister about $1200 derived from my husband's estate.' All of this money was, according to Mrs. Wilson, delivered in cash, no receipts were taken and no one else was present at the time.

"Notwithstanding intervenor's petition in which she claims the full ownership of all of this property, her testimony is that, with the exception of a small cottage on the 4728 Tulsa Street property, she only furnished one-half of the funds.

"The evidence shows that Mrs. Wilson's husband died in Arkansas in 1929 and that; shortly before the first property was bought in 1931, she came to Shreveport bringing with her 'several hundred dollars' in cash.

The purpose of turning the money over to Mrs. Rowland was, according to the testimony, to enable Mrs. Rowland to invest Mrs. Wilson's funds, in a home in which Mrs. Wilson could live, and later, in revenue producing property. Mrs. Rowland testified that she had an understanding with Mrs. Wilson that, should Mrs. Wilson die, the property would be Mrs. Rowland's. Mrs. Rowland collected all rents on the property, paid all the taxes and attended to all repairs and upkeep thereon. The rents and revenues of all three of the properties were reported in income tax returns signed by Mr. and Mrs. Rowland, as community income, and taxes thereon paid as such. When asked why, if she was merely acting as Mrs. Wilson's agent in the purchase and handling of these properties, she did not secure a power of attorney from Mrs. Wilson, so it could thus reflect the true situation, Mrs. Rowland simply stated that she was relying upon her lawyer, who drew the deeds in the form in which they were executed. Some documentary evidence in the form of certain memoranda and notes, letters and written statements of account between Mrs. Wilson and Mrs. Rowland, which Mrs. Rowland prepared, were presented and admitted in evidence. This was, for the most part, self-serving and in many respects contradictory. Mrs. Wilson, in her depositions, says that she has never received from Mrs. Rowland any statement or any accounting either of the funds placed in Mrs. Rowland's hands or of the rents, revenues or expenses of these properties. The revenues, as such, were not remitted to Mrs. Wilson, but Mrs. Rowland sent her money 'as needed.'

"Viewed as a whole, the most that the evidence shows is that Mrs. Wilson may have placed in Mrs. Rowland's hands some money, the amount of which we find ourselves unable to fix with any certainty. The evidence impresses us that whatever amounts so placed in Mrs. Rowland's hands were more in the nature of a deposit against which Mrs. Wilson might in the future draw in case of need, Mrs. Wilson apparently being of the opinion that Mrs. Rowland could better preserve it than could she. We think, too, that when the first purchase at 4728 Tulsa Street was made it was bought 'for' Mrs. Wilson, in the sense that it would provide a place for Mrs. Wilson to live in Shreveport, where Mrs. Rowland would be able to look after her and contribute to her needs and comfort, Mrs. Wilson being aged and not in the best of health. It is our impression also, that Mrs. Rowland, having in her hands some funds of Mrs. Wilson and having assumed the obligation of looking after Mrs. Wilson in the future, conceived the idea of making these purchases and securing the revenue the properties would produce, thus accomplishing at one and the same time the two-fold purpose of acquiring additional property and discharging the obligation to her sister.

"There is in evidence a counter letter, executed by Mrs. Rowland, in which she

states that these three properties were purchased with Mrs. Wilson's funds and for Mrs. Wilson, and that she and the community had no interest therein. But that document was not executed until 1944, after the original judgment in this case had been rendered recognizing the plaintiff as the heir of Mr. Rowland and entitled to his estate, which consisted only of his interest in the community of acquets and gains.

"In our opinion, since the property was paid for out of bank accounts belonging to the community, it must be held to belong to the community of acquets and gains, that the plaintiff is the owner of one-half thereof and one-half of the revenues therefrom since June 12, 1941, and defendant is bound to account to plaintiff therefor. The demands of the intervenor to be recognized as the owner of the property are rejected, at her costs."

■ In her intervention Mrs. Wilson prayed only for judgment decreeing her to be the true and lawful and full owner of the property. This demand is not supported by the evidence adduced and the applicable law, and it was properly denied. Since the evidence tends to show, however, that Mrs. Wilson did advance some funds (the exact amount is not disclosed) to Mrs. Rowland which the community used for its benefit and advantage we are of the opinion that the judgment should be amended so as to reserve to Mrs. Wilson the right

to seek recovery from the community of whatever funds she so advanced.

■ With respect to defendant's claim for advances from her separate funds to the community during its existence, we are not convinced, after our thorough study of the record, that the district judge manifestly erred in rejecting it. As to this item, he observed and concluded:

"We come finally to defendant's reconventional demand in which she claims a judgment against plaintiff for one-half of the amount of $19,873.77 claimed as having been advanced by defendant from her separate and paraphernal funds and estate to Mr. Rowland or to and for the benefit of the community of which he was the head and master. Of course, since we have held that defendant has not satisfactorily established the existence nor the amount of any separate and paraphernal funds owned by her at the time of the establishing of this community or thereafter, this claim must be rejected. Included in the total amount claimed as advances is the sum of $5,165.-75 which defendant claims to have expended over the years for household expenses. In support of this amount many checks were admitted in evidence drawn against and paid out of bank accounts which we have held to be community property. Also included in the total amount claimed as advances are numerous advances that defendant claims to have made to Mr. Rowland at times when, she says, he was un-

employed and without funds. Again in these cases the checks show to have been drawn against accounts which we have held to be community. Many of the checks presented in evidence do not show Mr. Rowland's endorsement and many of them are not even made out to him.

"The largest single item included in the total amount claimed as advances out of her separate estate to and for the community is an amount of $7,530. On December 13, 1909, Mr. Rowland opened a checking account in the Commercial National Bank of Shreveport, Louisiana, and the account book is in evidence as Rowland Exhibit 1-A. Attached to that exhibit is a note dated December 13, 1909, payable to the order of defendant in the exact amount of this deposit. Concerning this transaction Mrs. Rowland testified that, in the spring of 1909 when she was assisting Mr. Rowland in the operation of a pool hall in Shreveport, she became acquainted with a Mr. Scales, whom she describes as a 'broker' who was a frequent customer in the place of business. He inquired of her during the spring of that year if she would like to make some money. She replied that she would, and delivered to Mr. Scales the sum of $200 in cash, which she says was her separate and paraphernal funds. What he did with it or how he invested it she didn't know other than to state that Mr. Scales was operating in the commodities market at that time. She testified that on or about December

13 of that same year, Mr. Scales delivered to her his check for $7,530, representing the return of and profits on the $200 investment she had made that spring. She testified that she delivered this check to Mr. Rowland to be deposited for her but that, instead, he made the deposit in his own name, as heretofore indicated. She said she objected thereto and that he gave as his reason for his action that he desired to buy a home for them and other property, and that the owning of property would add to his prestige in the community. She testified that, on that same day, to-wit: December 13, 1909, Mr. Rowland executed to her his note, as above indicated, which note she presented and had admitted in evidence as Exhibit 1–B attached to Rowland 1–A. She testified that her brother was present at the time of this transaction. Her testimony in this respect was given in the late afternoon of one day of the trial, and, under repeated questioning on cross-examination, she insisted that the Exhibit Rowland 1–B was the identical note that Mr. Rowland executed on December 13, 1909. Thus committed her attention was called to the printer's notation on the bottom of the note which established that the note form was not printed until March of the year 1915. The following morning when court opened defendant stated to the Court that she wished to correct her testimony of the preceding afternoon, and then testified that after the adjournment of court the preceding after-

noon she had talked with relatives and had her memory refreshed, and then recalled that the note which had been filed in evidence dated December 13, 1909, had, in fact, been executed by Mr. Rowland late in 1915, just before she was preparing to enter a hospital because of illness. She said that she had, at that time, checked through her papers and had discovered that the note which she had testified Mr. Rowland had actually signed on December 13, 1909, and delivered to her, was not among them. According to her testimony, Mr. Rowland immediately executed the note Exhibit Rowland 1–B, which she wrote out and pre-dated December 13, 1909.

"The brother of Mrs. Rowland, who, she said, was present on December 13, 1909, when Mr. Rowland signed the original note testified in the case. He testified that he recalled the discussion between Mr. and Mrs. Rowland concerning the $7,530, but that he did not see Mr. Rowland sign any note and did not see any note at that time. Mrs. Rowland testified that when the duplicate which is in evidence as Exhibit R. 1–B was signed in the fall of 1915, her niece was present. The niece testified in this case that she was present and heard Mrs. Rowland telling Mr. Rowland that she had lost a paper and that Mr. Rowland then signed a paper but that she was unable to state whether it was a note or not.

"Plaintiff questioned the signature of this note and testified that it is not her father's signature. Two handwriting ex-

perts were presented by plaintiff and they testified that, in their opinion, it was not the genuine signature of Mr. Rowland. On the other hand, defendant testified that it is Mr. Rowland's genuine signature and that she saw him sign it. The defendant presented two handwriting experts who testified that in their opinion, it was the genuine signature of Mr. Rowland. We do not find it necessary to decide that question and have recounted the testimony and the evidence surrounding this transaction as a further demonstration of the unconvincing and unsatisfactory nature of much of the evidence in this case. We say it is unnecessary to decide that issue because, in the first place, the evidence does not satisfy us that the $200 was Mrs. Rowland's separate and paraphernal funds. In the second place, if the transaction was as she related it to be and she employed it through her broker in market operations and earned $7,350 profit, that would be community property under the jurisprudence of this state represented by Houghton v. Hall, 177 La. 237, 148 So. 37.

"In rejecting the defendant's claim for advances for the community, as well as our previous holdings herein affirming the community character of the property in dispute, we feel justified in making the observation that if spouses live together for a lifetime, or nearly forty years under the community of acquets and gains, and expect to preserve from confusion therewith any separate funds they may have had in

the beginning, positive and clear evidence thereof must be maintained and preserved. If the courts, in an earnest search for the truth, are unable to perceive it in the dimness and obscurity of the lapse of time and of frail memories, the parties have only themselves to blame."

The remaining disputed item is a small credit balance (amount not disclosed) in Mrs. Rowland's account in the Texas Avenue Branch of the First National Bank of Shreveport. This account, according to the evidence, contained only deposits of rentals from the Catherine Street property, which, as above shown, belonged to the community. The account, therefore, was a community asset.

For the reasons assigned the judgment appealed from is amended so as to reserve to intervenor, Mrs. Carrie T. Wilson, the right to seek recovery from the community that existed between Mr. and Mrs. Rowland of whatever funds she advanced to it; and, as amended, the judgment is affirmed.

O'NIELL, C. J., takes no part.

McCALEB, Justice (dissenting in part).

I cannot subscribe to the ruling herein that the 40 shares of paid up stock and the 60 savings shares of the First Federal Savings & Loan Assn. in the name of Mrs. Rowland are community property, inasmuch as these shares were acquired by Mrs. Rowland merely as the result of a recognition by the First Federal Savings & Loan Assn. of her interest in the Shreveport Mutual Building Association.

There can be no dubt whatever that the stock issued in Mrs. Rowland's name in the Shreveport Mutual Building Assn. was her separate and paraphernal property by reason of the provisions of Section 13 of Act No. 120 of 1902 and Section 34 of Act No. 140 of 1932 which declares, in substance, that shares in building and loan associations in the name of married women "shall be for the wife's or widow's separate benefit as paraphernal property, and, during the marriage as well as after the dissolution thereof, shall not form part of the marital community or of the estate of the husband for any purpose" and further, that the husband or any other party having any interest or claim adverse to that of the wife be given a delay of 90 days from the date the act shall go into effect to assert their claim, otherwise, "the ownership of said wife or widow in and to said shares shall be and remain absolutely incontestable; and the present statutory period of prescription and repose shall run and operate against all persons whomsoever, including minors, interdicts, married women, and the State of Louisiana."

The district judge held that Section 34 of Act No. 140 of 1932 was unconstitutional, despite our ruling in Carter v. Third District Homestead Ass'n 195 La. 555, 197 So. 230, that the husband (and, of course, those claiming under him) was without right to challenge the constitution-

ality of Section 13 of Act No. 120 of 1902 or Section 34 of Act No. 140 of 1932, where he failed to assert his claim within ninety days from the effective date of Act No. 140 of 1932. See also Ferguson v. Hayes' Heirs, 202 La. 810, 13 So.2d 223.

The majority express no opinion respecting the view of the district judge that Section 34 of Act No. 140 of 1932 is unconstitutional but it is concluded that, since Mrs. Rowland accepted the shares of the First Federal Loan Ass'n in exchange for the shares she owned in the Shreveport Mutual Building Ass'n., the shares she received in the Federal Association are to be regarded as community property, being amenable to the provisions of Section 2 of Act No. 95 of 1940 which declares that married women may subscribe for and hold shares in Federal savings and loan associations without the consent of their husbands and that such shares shall be the wife's separate property if they are purchased with her separate and paraphernal funds. It is reasoned that, when Mrs. Rowland agreed to and accepted the issue of the Federal Association's shares, in lieu of her stock in the Shreveport Mutual Building Ass'n., she became bound by Section 2 of Act No. 95 of 1940 and that, therefore, the burden was upon her to show that the original funds used in the acquisition of the shares were separate.

I take the position that the immediate property used for the acquisition of the shares in the Federal Association was un-

questionably the separate property of Mrs. Rowland (i.e., the shares in the Shreveport Mutual Building Ass'n.) and that, when the Federal Association issued its shares in exchange for that stock, the status of the shares are to be governed either by the well settled rule that "Where paraphernal property of the wife is given in exchange, that received in place of it partakes of the same character" (see Newsom v. Adams, 3 La. 231; also Lawson v. Ripley, 17 La. 238; Percy v. Percy, 9 La.Ann. 185; Troxler v. Colley, Sheriff, 33 La.Ann. 425, 428 and Dillon v. Freville, 129 La. 1005, 1014, 57 So. 316) or the doctrine announced in the leading case of Kittredge v. Grau, on rehearing, 158 La. 154, 165, 103 So. 723, 730 that, where stock in a corporation is issued for property owned by a person in his separate right, he acquires the stock "not by an actual transfer to him of something which he did not already own, but by the transformation of his interest * * * into an interest in the corporation."

If the funds which Mrs. Rowland used to purchase the stock in the Shreveport Mutual Building Assn., belonged to the community, she is indebted to the community to that extent. However, this fact cannot change the status of the homestead stock from paraphernal to community property. See Succession of Land, 212 La. 103, 31 So.2d 609 and Succession of Geagan, 212 La. 574, 33 So.2d 118.

In all other respects, I concur in the decree.

## On Rehearing.

HAWTHORNE, Justice.

A rehearing was granted in this case so that we might give further consideration to our former decree only insofar as it affirmed a judgment of the district court decreeing that 40 shares of paid up or investment stock in the First Federal Savings & Loan Association of Shreveport and 60 savings shares in the same institution, standing on the books of that association and registered in the name of Mrs. Rowland as of June 12, 1941, to be property of the community which formerly existed between Mr. J. H. Rowland and Mrs. Louise T. Rowland, and recognizing plaintiff, Mrs. Ferol R. Cameron, to be the owner and entitled to the possession of an undivided one-half interest therein, together with one-half of all rents, revenues, and income therefrom since the death of Mr. Rowland on June 12, 1941. Our decree on original hearing in all other respects has become final.

In 1930, during the existence of the community between Mr. and Mrs. Rowland, 40 shares of investment or paid up stock in the Shreveport Mutual Building Association were purchased in the name of Mrs. Rowland. In 1914, also during the existence of the community, Mrs. Rowland began to purchase in her own name savings shares in the same institution, continuing to make these purchases until the conversion of this institution in 1935 into the First Federal Savings & Loan Association

of Shreveport. After this conversion all of the shares, both savings and paid up, in Mrs. Rowland's name in the Shreveport Mutual Building Association were converted into stock in the First Federal Association. Subsequent to this conversion Mrs. Rowland continued to purchase in her name savings shares in the Federal Association. These purchases were made up to the time of Mr. Rowland's death, and were included in the 60 shares of savings stock. It is the ownership of the 40 shares of paid up or investment stock and of the 60 shares of savings stock which is here in dispute.

Whatever may have been the character or nature of the stock in the Shreveport Mutual Building Association, whether community or separate property, this character or nature was not changed by the reissuance to Mrs. Rowland of the stock in the Federal Association, as this was not an acquisition by, or transfer to, her of anything which she did not already own, but was only a transformation of her interest from one association to the other. Kittredge et al. v. Grau et al., 158 La. 154, 103 So. 723.

On original hearing this court found that all of this stock, the paid up as well as the savings shares, was purchased with funds belonging to the community which existed between Mr. and Mrs. Rowland prior to his death, and the character of these funds is no longer an issue in the case.

In the lower court, counsel for Mrs. Rowland, appellant, contended that all of the

stock, regardless of the time of its acquisition, became the separate property of Mrs. Rowland under the provisions of Sections 34 and 76 of Act No. 140 of 1932. Section 34 provided that "Married women may subscribe for, own, hold, withdraw, transfer, pledge, borrow upon and surrender shares in such associations [building and loan associations], without the consent or authorization of their husbands, and same shall be *for the wife's or widow's separate benefit as paraphernal property,* and, during the marriage as well as after the dissolution thereof, shall not form part of the marital community or of the estate of the husband for any purpose. In all cases in which, at the time of the enactment of the present statute any husband, heir, creditor, or other person or party in interest, or any building and loan association, claims or pretends or believes that the said husband, or his heirs, or creditors, or any other party or parties in interest, have any interest or ownership or claim whatsoever, adverse to the wife's or widow's interest in and to any building and loan association shares in the name of said wife and widow, suit to have said ownership and interest declared and recognized must be instituted by such party or parties or association within a delay of ninety days from the date when the present statute shall go into effect, and, in the absence of such a suit, filed within said delay, the ownership of said wife or widow in and to said shares shall be and remain absolutely incontestable; and the present

statutory period of prescription and repose shall run and operate against all persons whomsoever, including minors, interdicts, married women, and the State of Louisiana." (All italics ours.)

The second paragraph of Section 76 provided that "Any person holding shares in an association or otherwise interested, who attacks the constitutionality either of the waivers provided for in this Statute, or of any other provision of this statute, must file suit to that effect against the association within ninety days from the time when the present Statute goes into effect; and said period of ninety days is now fixed as the term of prescription within which any remedy in that behalf must be instituted in the courts by any member or other person; and the failure to file such suit within that delay shall be deemed and held by all courts at all times thereafter as an acquiescence in said waivers, or in any other provision of the present statute and after such ninety-day period no further attack on the constitutionality of said waivers or any other provision of the present statute can be presented; and the present statutory period of prescription and repose shall run and operate against all persons whomsoever, including minors, interdicts, and married women."

Counsel for Mrs. Cameron, appellee, then filed pleas of unconstitutionality as to the provisions of these sections. They contended that Section 34 was unconstitutional in that:

(1) It constitutes a taking and divesting of the property of Mr. Rowland without due process of law, in violation of Section 2 of Article 1 and Section 15 of Article 4 of the Louisiana Constitution, and the Fifth and Fourteenth Amendments to the Federal Constitution;

(2) It impairs the obligations of the marriage contract in respect to property rights, in violation of Section 15 of Article 4 of Louisiana Constitution, and Section 10 of Article 1 of the Federal Constitution;

(3) It tends to abolish forced heirship, in violation of Section 16 of Article 4 of the Louisiana Constitution.

Counsel contended that Section 76 was unconstitutional in that:

(1) It amounts to a divesting and taking of the husband's property without due process of law, and is in violation of Section 2, Article 1, and Section 15, Article 4, of the Constitution, and the Fifth and Fourteenth Amendments to the Federal Constitution;

(2) It requires courts to render declaratory judgments, not permitted under the Louisiana Constitution;

(3) It violates Section 6 of Article 1 of the Louisiana Constitution by denying adequate remedy by due process of law in open court;

(4) It deprives the courts of this state of the power to declare an act of the Legislature unconstitutional, in violation of Sections 1 and 2 of Article 2, and Section 1 of Article 3 of the Louisiana Constitution.

Counsel for defendant, Mrs. Rowland, filed a plea in bar of plaintiff-appellee's plea of unconstitutionality, alleging that, under the provisions of Section 76, the plea of unconstitutionality was untimely since more than 90 days had elapsed from the time the statute went into effect.

The district judge overruled the plea in bar of the plea of unconstitutionality, being of the opinion that Section 76 was unconstitutional insofar as it denied to plaintiff or any person in interest the right to question the constitutionality of any of the provisions of the statute. He held that all of the stock was community property, and in so holding concluded that Section 34 of the act was unconstitutional as applied to the facts in this case, in effect stating that the effect of this section was to transfer by legislative fiat to Mrs. Rowland the interest of Mr. Rowland in this stock purchased with community funds before the act was passed, and that this in his opinion, constituted a divesting of vested rights and was a denial of due process.

The paid up stock was purchased and acquired with community funds prior to the effective date of Act No. 140 of 1932, but, as pointed out hereinabove, only a portion of the savings shares was so acquired, the purchase of these shares of stock having begun in 1914 and continued up until the death of Mr. Rowland on June 12, 1941.

To determine the nature of the stock, that is, whether it is the separate property of Mrs. Rowland or belongs to the community, we must ascertain the period of time or the date of the various purchases, for in our opinion it is the statute or law in force and effect at the time these purchases were made which is decisive of the question. In order to answer this question we shall review the various acts of the Legislature which may be pertinent here.

In 1902 the Legislature adopted Act No. 120, which, according to its title, was to provide for the organization, regulation, supervision, etc., of building and loan associations, and to define the rights, powers, and privileges of such corporations and the members thereof. Section 13 of this act provided in part: " * * * Married women may subscribe for, hold, withdraw, transfer, pledge, borrow upon and surrender stock in such corporations without the consent or authorization of their husbands, and *same shall be for her separate benefit as paraphernal property."*

According to the record in this case, during the time when this act was in full force and effect, Mrs. Rowland acquired the 40 shares of paid up stock and began to purchase in her own name the savings shares. There is no doubt, therefore, that under the plain terms of this act the fully paid up stock became her separate property under the provisions of Section 13 set out hereinabove.

In 1932 the Legislature adopted Act No. 140, from which we have previously quoted Sections 34 and 76. This act, according to its title, also prescribed the rights, obligations, and duties of building and loan associations and all the members thereof, and with reference to building and loan stock read as follows: " * * * providing that shares in the name of a married woman shall belong to her as her separate property and fixing a period of prescription to set at rest all adverse claims to shares in such associations in the name of any married woman or widow. * * *" According to the repealing clause of this statute, certain laws and statutes were expressly superseded by the corresponding and relevant provisions of this statute, among these being Act No. 120 of 1902. Section 34 of the 1932 statute, as did Section 13 of Act No. 120 of 1902, provided that stock purchased by a married woman in her own name became her separate and paraphernal property. This section additionally declared, however, that the husband, heir, creditor, etc., claiming ownership or any of them having interest in any such stock purchased in the name of a married woman and adverse to her interest must institute suit to have said ownership and interest declared and recognized within a delay of 90 days from the effective date of the statute, and that, in the absence of such suit filed within said delay, the ownership of the wife should be and remain absolutely incontestable.

It is the prescriptive period under the provision of the act on which counsel for Mrs. Rowland relied in the lower court in support of their contention that all of the stock, whenever acquired, is her separate property.

Counsel for Mrs. Cameron contend that this section is unconstitutional in that it constitutes a taking and divesting of property without due process of law.

If we concede this to be true, it would prove of no avail to counsel for Mrs. Cameron insofar as the stock which was acquired prior to the effective date of the 1932 act is concerned, as these purchases would be governed entirely by the provisions of Act No. 120 of 1902, which was in full force and effect at the time the 40 investment or paid up shares were purchased and a portion of the 60 shares of savings stock, and which, as heretofore pointed out, made stock purchased in a building and loan association in the name of a married woman her separate and paraphernal property.

In Carter v. Third Dist. Homestead Ass'n, 195 La. 555, 197 So. 230, 233, this court in discussing Section 34 of the act of 1932 observed: "The Legislature recognized also that, although section 34 of the act of 1932 remedied the apparent defect in section 13 of the act of 1902 in so far as subsequent purchases of building and loan stock by married women were concerned, *the act of 1932 could not have any effect upon the ownership of building and loan stock that was acquired in the name of a married woman previous to the passing of the act of 1932.*"

In that case the suit was a contest between a husband and a wife over the ownership of stock in a building and loan association, which the husband contended was purchased with community funds previous to the year 1932. The wife contended that, under Section 13 of Act No. 120 of 1902 and Section 34 of Act No. 140 of 1932, stock purchased by a married woman in a building and loan association became her separate property. The husband denied that Section 13 of the 1902 act changed the community laws in that respect, even with respect to stock in building and loan associations, and argued that Section 13 of the statute could not be construed as making such a change in the community laws without rendering it unconstitutional, because no such object or purpose was indicated in the title of the act. This court affirmed the judgment of the district court declaring that the stock in dispute was the wife's separate property for the reason that any claim that the husband might have had on the building and loan stock was barred by the provisions of Section 34 of Act No. 140 of 1932, and that this statute barred any claim of any interest or ownership or claim whatsoever of the husband in or upon the building and loan stock in dispute in that case. The constitutionality of Section 34 of the 1932 act was not raised and was not an issue

in that case, and the court very properly concluded that the husband's claim to any interest or ownership in the stock was barred thereby.

It is unnecessary in the instant case for us to decide the constitutionality of Section 34 of the 1932 act, for the ownership of stock purchased by Mrs. Rowland prior to its effective date is not dependent upon the validity of the period of repose provided for in that section. As we have previously stated, the ownership of the stock purchased while the 1902 act was in force is governed by its provisions, and no plea of unconstitutionality was filed contesting the validity of that act.

Counsel for Mrs. Cameron strenuously urge in this court that, if we interpret Act No. 120 of 1902 as vesting title to these shares in Mrs. Rowland as her separate property, the act would be contradictory to, and in violation of, Section 16 of Article 4 of the Constitution of 1921, which prohibited the passage of any law abolishing forced heirship. Our construction of this statute, as we shall demonstrate later in this opinion, will not actually, or in practical effect, abolish the right of any heir.

In 1938 the Legislature of this state adopted Act No. 337, which amended the title to Act No. 140 of 1932, the pertinent part of which reads thus: "* * * providing that any married woman may purchase and dispose of shares in such associations as though she was a femme

sole * * *," and reenacted Section 34 of Act No. 140 of 1932 to read as follows: "Any married woman may subscribe for, own, hold, withdraw, transfer, give, pledge, borrow upon and surrender shares in such associations as a femme sole." Since this amendment omitted completely the prior provision that such shares would be the separate property of the wife, we consider that the Legislature intended that the ownership of such shares would thereafter be determined by the general laws of the state; therefore, the shares purchased by Mrs. Rowland from the effective date of this act until the effective date of Act No. 95 of 1940 are under its provisions community property.

In 1940 Act No. 95, relative to Federal savings and loan associations domiciled and doing business in this state, was adopted by the Louisiana Legislature. The purpose of Act No. 95, according to its title, was, among other things, to regulate the ownership and disposition of shares in such Federal savings and loan associations by married women and minors, and to prescribe the manner in which shares might be held, withdrawn, pledged, or surrendered by married women or minors or the legal representative of such minors. In Section 2 it was provided: "That married women may subscribe for, hold, withdraw, transfer, pledge, borrow upon and surrender shares in such Federal savings and loan associations without the consent or authorization of their husbands; and such shares shall be

the wife's separate and paraphernal property provided such shares were purchased with the separate and paraphernal funds of said wife, and both during the marriage and after the dissolution thereof shall form no part of the marital community." Under this provision of that act, the shares purchased by Mrs. Rowland after its effective date in the Federal Savings & Loan Association of Shreveport are community property.

The death of Mr. Rowland dissolving the community occurred on June 12, 1941, and up to this time Mrs. Rowland had continued to purchase in her name savings shares, the purchase of which was begun in 1914, the aggregate of which constituted the 60 savings shares of the Federal Savings & Loan Association of Shreveport. Since the record does not show the dates or amounts of these purchases, we cannot determine definitely how many or which of these shares of savings stock would be separate or community property, because this would have to be ascertained by reference to the act which was in effect at the time of each purchase.

■ A consideration of all of these acts convinces us that the provisions thereof dealing with the purchase of stock by married women had for their object to protect building and loan associations and all persons in dealing with a married woman with reference to stock of such associations standing of record on the books in her name, and, further, to encourage saving and investment in such associations by married women and to facilitate trade in such stock.

We do not think it was the intent and purpose of the Legislature by adopting such statutes to divest the community of the funds, used in the purchase of building and loan stock, which would otherwise belong to the community under the general law of this state relative to community property, nor were these statutes intended by the Legislature to be a means to defeat and defraud the community or the interest of any heir. The Legislature did not intend, by the provisions in the various acts making the separate property of a married woman stock standing on the records of the association in her name, to deprive the community of the right to demand at its dissolution restitution of its funds used to purchase stock which was the separate property of the wife.

■ Furthermore, we do not know of any constitutional prohibition against the enactment by the Legislature of a statute providing that stock bought by a married woman, standing on the books of the building and loan association in her own name, was her separate and paraphernal property, provided that such act is given prospective effect only. Of course, in the event such stock is purchased by the wife with community funds, although the stock will be the wife's separate

property pursuant to such statute, nevertheless, under the general community property law of this state, she will be indebted to the community at its dissolution for the purchase price thereof. When given this interpretation, such a statute in no manner divests any vested right and is not a denial of due process.

For these reasons, we are of the opinion that the 40 shares of paid up stock in the First Federal Savings & Loan Association of Shreveport, standing on the books of the association as of June 12, 1941, in the name of Mrs. Rowland, are her separate property, having been purchased under the provisions of Act No. 120 of 1902. With reference to the 60 savings shares registered in the name of Mrs. Rowland as of June 12, 1941, in the same institution, all that portion of the stock purchased under the provisions of Act No. 120 of 1902 and of Act No. 140 of 1932 prior to its amendment by Act No. 337 of 1938 is also the separate property of Mrs. Rowland. All that portion of the savings stock purchased subsequent thereto and until the time of Mr. Rowland's death is governed by the provisions of Act No. 337 of 1938 and Act No. 95 of 1940, and is community property.

Mrs. Rowland, however, is indebted to the community for the full purchase price of the 40 shares of paid up stock and also for the purchase price of all that portion of the 60 savings shares acquired before the effective date of Act No. 337 of 1938.

Since Mrs. Rowland began the purchase of these stocks in 1914, and since these purchases continued until Mr. Rowland's death in 1941, and since the record does not disclose with exactness the dates of her many purchases, it is necessary that we remand the case to the lower court so that an accounting may be had to determine Mrs. Rowland's indebtedness to the community.

Counsel for Mrs. Rowland have filed a supplemental brief on rehearing in this court, strenuously urging that, if this court should find that any of the shares are Mrs. Rowland's separate property, Mrs. Rowland is not accountable to the community for its funds used to purchase such shares. This argument is made on two grounds—first, that the funds of the community used in the purchase of these shares were a gift of movables from Mr. Rowland to Mrs. Rowland, and, second, that the pleadings presented in this case do not authorize this court to issue a decree recognizing an indebtedness of the separate estate in favor of the community estate.

In answer to the first ground, we find no evidence whatever of a gift by Mr. Rowland to Mrs. Rowland of the community funds she used to purchase the shares. As to the second ground, while there may be no specific prayer in the pleadings for a decree recognizing the indebtedness of the separate estate to the community, we feel that in the interests

of equity and justice our decision in this matter requires such a decree.

For the reasons assigned, the judgment appealed from, recognizing the ownership of the stock here in dispute to be community property, is set aside, and it is now decreed that the 40 shares of paid up or investment stock in the First Federal Savings & Loan Association of Shreveport, standing on the books of that association as of June 12, 1941, in the name of Mrs. Louise T. Rowland, are her separate property. It is further decreed that that portion of the 60 savings shares of the First Federal Savings & Loan Association of Shreveport, registered in Mrs. Rowland's name, purchased by her prior to the effective date of Act No. 337 of 1938, is her separate property, and that all that portion of said stock purchased subsequent to the effective date of this act is property belonging to the community. It is further ordered that this case be remanded to the lower court for the purpose of an accounting to establish Mrs. Rowland's indebtedness to the community for the purchase price of all stock decreed to be her separate property.

Appellant, Mrs. Rowland, is to pay all costs of this rehearing.

The right is expressly reserved to all parties at interest to apply for a rehearing.

O'NIELL, C. J., does not take part.

HAMITER, J., is of the opinion that the original decree should be reinstated.